**Dr. Sharon JOHNSON**

v.

**The UNIVERSITY OF PITTSBURGH, Wesley W. Posvar, Francis S. Cheever, Donald N. Medearis, Edward C. Heath, The Board of Trustees of the University of Pittsburgh, William H. Rea, George A. Stinson, Roger S. Ahlbrandt, Henry L. Hillman, Leon Falk, S. Harris Johnson, Leslie B. Worthington and Harvey J. Haughton.**

Civ. A. No. 73–120.

United States District Court,
W. D. Pennsylvania.

Aug. 1, 1977.

Sylvia Roberts, Baton Rouge, La., for plaintiff.

Charles C. Arensberg, Leonard L. Scheinholtz, Pittsburgh, Pa., for defendants.

### ADJUDICATION, FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

KNOX, District Judge.

## I.  INTRODUCTION

Dr. Sharon Johnson, an assistant professor in the Department of Biochemistry of the School of Medicine at the University of Pittsburgh brings this action for alleged sex discrimination in connection with the refusal of the University at the end of her second three-year contract as an assistant

professor to promote her to the rank of associate professor and grant her tenure as a member of the faculty. The accompanying result was termination of her employment. Plaintiff originally sought a preliminary injunction against the termination of her employment on June 30, 1973 which also would have resulted in termination of grants received from the National Institute of Health. After five days of hearings, the court determined that the plaintiff had made out a prima facie case, and that irreparable harm would result if the status quo was not preserved. A preliminary injunction was therefore issued retaining her in her job as assistant professor at the University pending outcome of what appeared to be complex and protracted litigation. See *Johnson v. Univ. of Pgh.*, 359 F.Supp. 1002 (W.D.Pa.1973).

The forecast as to the complex and protracted nature of the case although not a class action has been borne out by subsequent events. The case was tried non jury before the court, plaintiff having waived her rights to jury trial with respect to causes of action for damages under the Civil Rights Act, 42 U.S.C. §§ 1983 and 1985(3). Trial on the merits occupied the court for a period of 74 days during seventeen weeks. 12,085 pages of testimony were taken, 73 witnesses were heard some of them being on the stand for many days and close to 1,000 exhibits were received in evidence.

During the trial, the court has been required to make excursions through the very frontiers of human knowledge in the ever advancing field of biochemistry. The case is also an example of the devastating effects of sex discrimination cases of this kind against universities upon the work and calendars of the United States courts, and the commitments and time of trial counsel. Attempts to curtail the case proved fruitless in view of plaintiff's claim, for which there appeared to be a reasonable basis that because of sex discrimination males had been hired and promoted in her department who were less qualified than she was to receive promotion and tenure. This necessitated the examination of the professional credentials of numerous professors, a task for which the court like probably most federal judges was ill suited. The case of *Cussler v. University of Md.*, 430 F.Supp. 602 (D.Md.1977) is another illustration of the problems posed by a case of this kind. Before proceeding with the opinion and discussion, in view of the multitudinous factual problems presented, the court will make the following detailed.

## II. FINDINGS OF FACT

1. The plaintiff is Dr. Sharon L. Johnson, a female assistant professor employed by the University of Pittsburgh (hereinafter Pitt) in the Biochemistry Department of the School of Medicine. Pitt is a large university with many schools and colleges headquartered in Pittsburgh, Pennsylvania. It has 35,000 students and 7500 employees.

2. The plaintiff's action is based on the Civil Rights Act of 1964, Title VII, as amended, 42 U.S.C. § 2000e, et seq. The Civil Rights Act of 1871, 42 U.S.C. § 1983, the Civil Rights Act of 1861, § 1985(3) and Article 1, Section 28 of the Pennsylvania Constitution. The defendants in the Title VII action are the University of Pittsburgh, Dr. Donald N. Medearis, Dean of the Medical School, and Dr. Edward C. Heath, Chairman of the Biochemistry Department. The defendants in the plaintiff's action based on 42 U.S.C. §§ 1983 and 1985(3) and the Pennsylvania Constitution are the University, Dr. Medearis, Dr. Heath, the Chancellor, Dr. Wesley W. Posvar, the Vice Chancellor for the Health Professions, Dr. Francis S. Cheever, and certain members of the Board of Trustees of the University. William H. Rea, George S. Stinson, Robert A. Ahlbrandt, Henry L. Hillman, Leon Falk, Dr. S. Harris Johnson and Harvey J. Haughton. The Chancellor at Pitt performs the functions of president in other universities.

3. In 1967, Dr. Moldave then Chairman of the Biochemistry Department of the Medical School hired the plaintiff at the rank of assistant professor in the Biochemistry Department. Plaintiff had obtained her Ph.D. degree in chemistry in 1959 and, as of 1967, had published nine papers. Prior to coming to Pitt the plaintiff spent six years at Mellon Institute, Pittsburgh, under two three-year contracts. At Mellon Institute the plaintiff testified that she started

in the biology unit and then transferred to either the organic chemistry group or the physical-organic chemistry group. (Transcript of Trial (hereinafter T) 1214-5.) (Johnson).

After leaving Mellon Institute, Plaintiff spent one year at Vassar College as an associate professor of chemistry without tenure. Preliminary Injunction Transcript (hereinafter P.I.) 25-27, T. 1206, 1909 (Johnson); P.E. 70. The National Institute of Health grant which she had obtained at Mellon Institute was transferred by plaintiff to Vassar in 1965. After leaving Vassar in 1966, plaintiff spent one year as a chemist for Westinghouse where she did research on the physical and chemical properties of liquid crystals.

4. The plaintiff was employed originally at Pitt at an annual salary of $13,000 which had increased to $18,000 in 1973 after certain raises and cost of living increases. The salary she received was higher than the salary paid to a male assistant professor in the Department who had been hired in 1961. D.E. 107.

5. In 1967 Dr. Moldave also hired Dr. Nakada at the rank of associate professor with a salary of $18,500 in the Biochemistry Department. Based on his outstanding qualifications, Dr. Moldave actively sought to recruit Dr. Nakada as a member of the faculty.

From 1955 to 1958, Dr. Nakada was an outstanding scientist of renown having been a faculty member of Osaka University in Japan; a visiting assistant professor at Columbia University; a visiting assistant professor at MIT and a project leader in charge of a large research group at E. I. Du Pont DeNemours & Co. The salary paid was appropriate for someone of Dr. Nakada's stature.

6. At the time Dr. Nakada and Dr. Johnson were hired, Dr. Nakada had a considerably more impressive bibliography and was a senior scientist with substantial research achievements in the area of biochemistry as compared with Dr. Johnson, a junior scientist who had not yet achieved full development and whose work was characterized as being in the area of physical-or-

ganic chemistry which was beginning to lean in a more biochemical direction. T. 725 (Mandel). In the seven years from 1960-67, Dr. Nakada had 24 publications as compared to the nine papers published by plaintiff during the eight-year period since receiving her Ph.D. T. 3711-5 (Cheever).

7. When the plaintiff was hired by Dr. Moldave, three other individuals were already employed in the department at the rank of assistant professor, Drs. McNary, Weliky and Diven. In addition to the plaintiff, Dr. Moldave hired Drs. Bishop, Arfin and Ihler as assistant professors in 1969. In 1970, Dr. Moldave hired another assistant professor, Dr. Phillips.

8. In 1969 Dr. Diven transferred his primary appointment from the Biochemistry Department to the Pathology Department which assumed responsibility for his salary. In the Spring of 1971 he was given tenure in the pathology department which was responsible for his salary and his primary department. He was also promoted to associate professor in the Biochemistry Department where his appointment was secondary. Dr. Heath was likewise informed of this.

In 1970 the appointments of Dr. McNary and Weliky, both males were not renewed, and in 1971 Dr. Bishop, also a male, was terminated. T. 10,929-34 (LiVolsi); T. 11,-787-9 (Nakada); D.E. 107.

9. Dr. Moldave resigned as department chairman in 1970 to go to the Department of Biological Chemistry of the California College of Medicine, University of California at Irvine.

The Department Under Dr. Basford.

10. Dr. Robert Basford became the acting chairman of the Department of Biochemistry of the School of Medicine for the period from July 1970 to July 1971.

11. During this period, no new faculty appointments were made. However, the following changes in personnel occurred:

a. Dr. Arfin resigned to take a position in Dr. Moldave's new department.

b. Dr. Ihler was promoted to the rank of associate professor in the Spring of 1971.

# 1334

c. Dr. Nakada who was already a tenured member of the faculty, was promoted to the rank of full professor.

12. Dr. Basford recommended Dr. Ihler for promotion to the rank of associate professor on February 15, 1971. At that time there was a competing offer for his services from Dr. Moldave at the University of California. His promotion was approved by the ad hoc committee appointed by the Dean in accordance with usual university procedures. Although Dr. Heath was not chairman at the time his selection was known and Dean Medearis as a courtesy wrote to Dr. Heath to inform him of Dr. Basford's recommendation.

13. With respect to Dr. Diven's primary appointment in pathology and secondary appointment in Biochemistry an ad hoc committee was appointed chaired by Dr. Hayashi.

Dr. Hayashi testified that the weight to be given to teaching, research productivity and outside letters of recommendation would have been different if Dr. Diven were being considered for appointment to tenure in the Department of Biochemistry, where service is not an important element. Dr. Ebert concurred that a person with a joint appointment in pathology and biochemistry might be qualified for tenure in the pathology department because of his service contribution, but unqualified for tenure in the biochemistry department.

As is customary when Dr. Diven was promoted to tenure in the pathology department, he was also promoted to the rank of associate professor in the biochemistry department where he held a secondary appointment. Dr. Hayashi explained that Dr. Diven would not have had the rank of associate professor in the biochemistry department if he had not been promoted to tenure in the pathology department. T. 11,566, 11,589 (Hayashi). Although the committee was only concerned with Dr. Diven's qualification for promotion in the department of pathology, Dr. Basford was consulted as acting chairman of the department of biochemistry to make certain that he had no objections in view of Dr. Diven's secondary appointment in his department. T. 11,571, 11,588 (Hayashi).

Dr. Heath was also informed of Dr. Diven's promotion as a matter of courtesy. Since Dr. Diven was receiving tenure in the pathology department, Dr. Heath testified that he would not have voiced any objection except under extraordinary circumstances since Dr. Diven's primary appointment was in the pathology department, which was entirely responsible for his salary. T. 2708–13 (Heath); T. 6475 (Medearis); T. 10,972, 11,027 (LiVolsi). Dr. Heath testified, however, that after hearing Dr. Diven lecture to the medical students in the freshman biochemistry course, he gave Dr. Diven no further assignments in that course. T. 2706, 3490 (Heath).

14. Because the post of chairman of the department of biochemistry became vacant with Dr. Moldave's departure in June of 1970, the Dean of the School of Medicine determined that it would be an appropriate time to consider whether the biochemistry department should continue as an independent department in the medical school or whether it should be merged into the biochemistry department of the School of Arts and Sciences.

Accordingly, a committee chaired by Dr. Jack Myers was formed to consider the future of the biochemistry department in the school of medicine.

15. The committee chaired by Dr. Myers perceived that the mission of the department of biochemistry in the school of medicine was to teach medical students and to do research oriented toward medical science in order to provide a basis for interaction between the biochemistry department, a preclinical department, and the clinical departments in the medical school. The committee felt that it was important for medical students to understand the clinical relevance of biochemistry, a goal which had been previously highlighted by a report of the Board of Visitors to the School of Medicine. It was found that the department was ineffective in carrying out these responsibilities. P.E. 553. Teaching biochemistry to medical students was felt to differ significantly from teaching biochemistry to

graduate and undergraduate students, the latter being recognized as a secondary function of the department of biochemistry in the school of medicine. The court finds these conclusions to be reasonable. See Myers 8911 P. Ex. 2054.

16. As a result of their deliberations, the committee concludes that the department of biochemistry in the medical school had a unique function and should not be merged into the biochemistry department of the school of arts and sciences. (Myers 8911). The committee determined that the mission of the biochemistry department could be fulfilled if appropriate and vigorous leadership was provided by the chairman.

17. Thereafter, a search committee, chaired by Dr. Julius Youngner, was appointed by Dean Medearis to select a new chairman for the biochemistry department of the school of medicine. The search committee was charged with the responsibility of identifying an individual who was preeminent in the field of biochemistry, excellent in research, vitally interested in teaching medical students and experienced in administration.

18. The search committee solicited names of potential candidates from more than three dozen experts, resulting in a list of 60 or 70 names. In addition, the committee advertised the position in the Journal of Science. T. 4679, 4687 (Bentley). In their search for appropriate candidates, the committee and the dean were particularly interested in identifying female candidates, and the committee made a special effort to solicit the names of qualified women to fill the position. Youngner 8583–85, 8643–6.

19. Of the 60 or 70 individuals identified, five were invited by the committee to give seminars at the University of Pittsburgh. Of the five persons who were invited to present a seminar, one was a woman, Dr. Elizabeth Neufeld. Another woman who was contacted, Dr. Mary Ellen Jones, declined to be considered.

20. Dr. Edward Heath was one of the candidates who was invited to give a seminar. He had been recommended to the committee by two separate individuals, one a man and one a woman and his other credentials and experience indicated he was well qualified.

21. The search committee recommended to the dean that Dr. Heath be offered the position as chairman of the department of biochemistry. In addition, Dr. Heath met with Dr. Myers who was the chairman of the committee to evaluate the biochemistry department and a consultant to the search committee. Dr. Myers approved the choice of Dr. Heath, particularly in view of Dr. Heath's knowledge in the area of medical education and his plans for the development of the department, which included interaction with other departments in the medical school and the teaching of biochemistry in a manner relevant to medical science.

22. The search committee also seriously considered Dr. Neufeld for the position of chairman, but determined that Dr. Heath was a superior candidate because he had had substantial experience in teaching medical students and in carrying out administrative responsibilities in a medical school setting. Dr. Neufeld did not have such teaching and administrative experience; however, had Dr. Heath declined the offer, the committee would have recommended that Dr. Neufeld be offered the position.

23. Dr. Heath was offered the position of chairman in March, 1971 and accepted the position in late March or early April 1971.

24. Heath had broad powers to revitalize the teaching and research programs of the department of biochemistry. Myers 8923, 8943. Two chairmen had recently left and there had been an erosion of morale and spirit and a loss of direction and leadership. (Youngner 8579–81; J.E. Johnson 7230–31). Dr. Heath had not only the prerogative but the express duty to define a mission for the department and to take whatever steps were necessary to reshape the department consistent with that mission. The court finds that a medical school has the authority to reshape a department by appointing a new chairman.

25. Consistent with the charge of the search committee, Heath defined the primary mission of the biochemistry department as the teaching of medical students

and the development of a high quality medical school teaching program. The court finds that the primary mission of a medical school is the teaching of medical students; graduate teaching is a secondary function only.

26. Between January 1971 and July 1971 when Dr. Heath assumed the position of chairman of the department of biochemistry, he visited the department on six different occasions for a total of 12 days.

During these visits, he met with the faculty of the department for the express purpose of apprising them of the mission for the department, including the medical school teaching program and the research program for the department. T. 2675, 2749, 8696 (Heath); T. 8654 (Youngner).

Dr. Heath testified that he met with the faculty of the department and discussed his mission and plans. It may be inferred that plaintiff attended these meetings and approved of Heath's plan.

27. The new chairman was limited in his ability to implement his mission by financial and physical constraints over which he had no control. The only means by which changes could be implemented was by changes in the faculty. The chairman was, of course, unable to make any changes with respect to tenured faculty. New faculty could be appointed if positions were available. The only other opportunity a new chairman has for reshaping the department is to replace probationary or nontenured faculty. The accomplishments of probationary employees must therefore be evaluated in light of the departmental mission. The fact that a nontenured faculty member has served in the department prior to the arrival of the new chairman does not preclude the chairman from evaluating faculty for tenure in terms of his mission.

28. After assuming the position of chairman, Dr. Heath took steps to implement the mission which he had previously stated to the faculty, viz:

He revised the biochemistry course to stress a more biological and pathological orientation. He also requested all faculty to attend the lectures in the medical school biochemistry course and initiated the prac-

tice of conference session with the medical students for the purpose of linking biochemistry and disease, a teaching method which the plaintiff agreed was effective. (T. 245–50).

Also, in order to stimulate interaction within the department, Dr. Heath instituted the Journal Club where matters of mutual scientific interest could be discussed.

29. In accord with his policy that all faculty attend the medical school biochemistry course lectures, Dr. Heath, as well as other members of the faculty, had the opportunity to observe the plaintiff lecture to first year medical students in the Fall of 1971. During this time, the plaintiff was assigned to give four lectures in the freshman biochemistry course. The plaintiff's teaching performance throughout all four lectures was poor. During each class, the students expressed their dissatisfaction by making rude noises, audible complaints and by walking out during the lecture period. Toward the end of the period in one lecture in particular, Dr. Johnson was attempting to explain data which she was writing on blackboards, she had her back to the audience and failed to notice a student who had raised his hand to ask a question. After some period of time, she turned around and recognized the student who expressed his frustration and dissatisfaction as follows:

"Yes, I have had a question for the last ten minutes. I have had my hand in the air but you have been ignoring me. You have been ignoring all of us. You didn't seem to come here to teach us. You seem to come here to confuse us. I have been to your lectures and I know less than when I came in." T. 9382–3.

Other students then joined in the criticism of the lectures. The disturbance increased in volume and intensity as students began shouting and swearing at the plaintiff, accusing her of failing to present clear and comprehensible lectures. T. 9383 (Finn); 9918 (Glew). Dr. Glew described the scene as follows:

Well, I can recall specifically about halfway through the lecture that I referred to when I was sitting in a row in class with about 10 or 12 other students

and all those students that I was close to stood up and began to shout obscenities in the middle of the lecture and then complete chaos broke out.

The class, as a whole, many vocal points of abuse arose. In fact, the abuse and the language was so extreme that I had never seen anything like it in a classroom. I recall, in fact, one of the girls sitting next to me was a freshman medical student and she stood up and in very foul language and screamed out to Dr. Johnson, "What the fuck are you doing. I can't understand a single word you are saying," and I remember talking with the same student about two days later because I had approached that student and I cautioned her that if she, in subsequent lectures, continued to attack Dr. Johnson in that manner that I would not permit her to participate in these review sessions, these lectures, that I was giving on the same material. T. 9918.

The disruption terminated when students stood up and left the room. While Heath may not have taken proper steps to control the situation he certainly was not responsible for it having arisen.

30. Throughout the demonstration, the plaintiff appeared to be unable to comprehend the seriousness of the problem and took no steps to bring the class under control or to respond to students' criticism in an effective manner.

31. The faculty who observed it characterized the outburst as a "boisterous and unruly revolt", "a massive rebellion", "a small riot", and a "Boisterous outburst". They testified that it made an extraordinary impression on them since they had never witnessed such an extreme student reaction. Although the faculty did not condone the students' behavior, they testified that the frustration and dissatisfaction of the students was justified by Dr. Johnson's complete failure to present the material in a logical and comprehensible fashion. Dr. Finn testified that even she, as a faculty member of the department of biochemistry, was unable to understand Dr. Johnson's presentation prior to the outburst. T. 9384. Dr. Grooms, one of plaintiff's witnesses, who was then a student in the class, admit-

ted that he had never seen a similar outburst where students stood up and cursed a teacher. Although plaintiff implies that the student reaction stemmed from general student unrest, there is no evidence that lectures of other faculty members were so poorly received. Nor is there evidence that the material is more difficult than that taught by others. Dr. Myers expressly negated plaintiff's claim that such an outburst could arise from student impatience with chemical versus clinical material; in his experience teaching in the medical school, including lectures in the medical biochemistry course, he testified that he had not observed such student impatience.

32. The student dissatisfaction with Dr. Johnson's performance was so widespread that another junior faculty member, Dr. Glew, at the request of the students, initiated a series of evening lectures which covered the same material presented by plaintiff. Although the lectures were optional, approximately one-half to two-thirds of the freshman medical students attended his lectures. Dr. Glew testified that he has never perceived the need to provide supplemental lectures to such a large cross section of a class.

33. Although Dr. Glew was willing to provide assistance to the freshman medical class with respect to Dr. Johnson's lectures, he made it clear to the students that he would do so only on the condition that no further outbursts occur during plaintiff's remaining lectures. He hoped that his admonitions to the students concerning their behavior, coupled with the availability of evening tutorial sessions, would eliminate any further student disruptions during plaintiff's lectures. Dr. Glew's actions were apparently effective since no further outbursts occurred during plaintiff's lectures, even though the quality of her presentations did not improve. The significance of these incidents was clearly a matter for the tenure faculty to consider in evaluating plaintiff's promotion.

Dr. Heath's Recruitment Program.

34. When Dr. Heath was hired, there were four vacant positions in the department. To fill these positions Dr. Heath

sought people who were well trained, who had worked with important individuals, and who had good recommendations from their mentors. In addition, Dr. Heath wanted people whose research showed some degree of independence in an area significant to human biology. In recruiting junior faculty, the criteria considered are background, training, recommendations, plans for research and potential for development. As Dr. Ramey and Dr. Mandel testified, a first appointment at the rank of assistant professor is made on the basis of promise of future performance. This is in contrast to evaluating faculty for tenure, where the primary inquiry is as to the accomplishments of the candidate, not promise.

35. Dr. Heath filled the first position with Dr. Robert Glew. Glew had previously spent three years with Dr. Heath as a post doctoral fellow at Johns Hopkins University and Dr. Heath thus had first hand knowledge of Dr. Glew's teaching ability and research interests.

At the time Dr. Glew was hired, he had had his Ph.D. in biochemistry for three years, had two publications and was employed by the University of Louisville Medical School as an assistant professor. At Johns Hopkins, Dr. Glew carried out research involving the transport of proteins across cell membranes. At the time Dr. Heath interviewed Dr. Glew, his research was in the area of glycoprotein structure and metabolism which occurs in mammalian cells. The court finds Dr. Glew's teaching and other qualifications fully justified an initial appointment.

36. With respect to the remaining three positions which he had authority to fill, Dr. Heath contacted as many people as he could by telephone, letter and at professional meetings in order to solicit the names of potential candidates. He also requested suggestions from members of the department. At least one of the individuals he contacted was a woman, Dr. Mary Jane Osborne. In addition, Dr. Heath indicated to one of his recruits, Dr. Cerami, that he was actively seeking women candidates, and requested that Dr. Cerami supply names of any such candidates.

He received the names of 80 to 100 persons. Of this number, he invited 15 for interviews. Of the 15 he invited, there were 12 men and 3 women and of those, Dr. Heath extended offers to 6 men, Drs. Cerami, Walsh, Curthoys, Stancel, Prouty and Rifkin, and to 2 women, Drs. Coffee and Rifkin. Two of the men, Drs. Curthoys and Prouty, accepted the offer as did one woman, Dr. Coffee.

The individuals to whom Dr. Heath extended offers clearly meet the criteria which he had established for the departmental mission.

37. Since much has been made of the attempt to hire Dr. Christopher Walsh we will deal with this incident in some detail.

Dr. Walsh visited the department on September 20 and 21, 1971 and received an offer from Dr. Heath on December 15, 1971.

Dr. Walsh had obtained his undergraduate degree from Harvard College where he was awarded a Widener Scholarship. He had earned his Ph.D. in biochemistry at Rockefeller University in the laboratory of Dr. Fritz Lipmann, a Nobel Laureate. As a post-doctoral student, Dr. Walsh was awarded a Whitney fellowship, a highly competitive award, to work in the laboratory of Dr. Robert Abeles at Brandeis University for two years.

Dr. Abeles recommended Dr. Walsh to Dr. Heath as the best post-doctoral fellow he had ever had. Dr. Heath felt that this recommendation from Dr. Abeles was extremely favorable since Dr. Abeles has trained many post-doctoral students and is a highly critical mentor. In addition to Dr. Abeles' recommendation, Dr. Heath received strong recommendations from other individuals who were familiar with Dr. Walsh and with his work.

At the time Dr. Heath interviewed Dr. Walsh, he had had his Ph.D. for one year and had five publications with one additional publication in press and other submitted to the Journal of Biological Chemistry. Dr. Walsh had by that time already established himself as an enzymologist who had studied enzyme reaction mechanisms using the enzyme itself. Both the plaintiff and her expert witness, Dr. Mandel, agreed that as

of 1971, Dr. Walsh had conducted research with enzymes which occur in living cells.

While it appears that Dr. Walsh's work with enzymes was similar to plaintiff's it is claimed that his direction was more compatible with that set by Dr. Heath for the department. The experts disagree on this and the court holds that plaintiff has not carried her burden of proof of showing that this action constituted sex discrimination.

At approximately the same time that Dr. Walsh received the offer from Dr. Heath, he also received job offers from the University of Pennsylvania, Princeton University and Massachusetts Institute of Technology. He subsequently accepted a position at MIT as an assistant professor of biology and chemistry. He has since been promoted to the rank of associate professor.

38. On October 4 and 5, 1971, Dr. Heath interviewed Dr. Carol Coffee, a female and on February 10, 1972, he offered her a position which she later accepted. While the offer to Dr. Coffee was delayed pending other interviews, there is no evidence that she was treated differently from male applicants by Dr. Heath in any substantial manner.

39. In February and March, 1972, Dr. Heath interviewed Dr. Walter Prouty and Dr. Norman Curthoys. Dr. Heath offered them positions which they accepted. The court finds no abuse of discretion in Heath's determination that they were qualified for an initial appointment.

40. Linda Cohen Barancik, a female, never formally applied for a position in the biochemistry department and never sent Dr. Heath a copy of her curriculum vitae. Dr. Barancik only casually mentioned to Dr. Heath in the most general terms that she was looking for a job during a conversation between the two in the hall shortly after Dr. Heath arrived at Pitt. Dr. Heath did not actively recruit Dr. Barancik because he did not think her serious in the absence of a follow up and because he had knowledge of her work from the time that they were both at Johns Hopkins and he was not particularly impressed with it. The court cannot say this determination was unreasonable.

41. A question has been raised concerning the termination of Dr. Molly Vogt by the department of biochemistry but there is no evidence that it resulted from sex discrimination. In the summer of 1971, Dr. Vogt held a primary appointment in the School of Health Related Professions (SHRP) and a secondary appointment in the biochemistry department of the medical school. Prior to departing on sabbatical, Dr. Basford and Heath agreed that Dr. Vogt would be devoting full time to SHRP and that her secondary appointment in the department of biochemistry, which was expiring on August 31, 1971, should not be renewed. Dr. Heath testified that the department would be willing to reconsider a position for Dr. Vogt at a later date if she wished to resume activities in the department.

Dr. Basford agreed to notify Dr. Vogt of the decision concerning her appointment, but forgot to do so before leaving the country. D. Ex. E. Dr. Heath was unaware of this oversight. Dr. Heath had, however, in September, 1971, notified Dr. Anne Pascasio, Dean of SHRP, that Dr. Vogt's appointment would not be renewed since she would be teaching full time in SHRP. Because of an erroneous notice received by Dr. Vogt that her secondary appointment continued until 1973; Dr. Pascasio thereafter contacted Dean Medearis to clarify the confusion. He reviewed the matter and determined that the decision concerning Dr. Vogt's appointment was appropriate.

When Dr. Heath learned in February, 1972 of Dr. Basford's failure to notify Dr. Vogt of the decision, he met with her to apologize for the error and assured her that he would be willing to reconsider her appointment should she so desire. Dr. Heath had previously made the same representation to Dean Pascasio. Dr. Vogt, however maintained her full time position in the SHRP where she continued to advance. The court finds that failure of communications not sex discrimination was responsible for this snafu.

## Tenure Procedure

42. Faculty appointments in the medical school are characterized as tenure stream or

non-tenure stream appointments. The former consist of the ranks of professor, associate professor, assistant professor and instructor. Tenure is awarded only at the ranks of associate professor and professor. All other faculty appointments are in the non-tenure stream, where tenure is not awarded.

43. A non-tenured position is a probationary appointment, usually for three years during which time the faculty member must establish that he has attained the qualifications necessary to justify a tenured appointment. Tenure is not automatic; the mere fact that a person has received an academic appointment in the tenure stream does not guarantee that the faculty member will develop the qualifications necessary for tenure. Chancellor Posvar testified that only half of those hired into the tenure stream at Pitt eventually receive tenure. T. 8337, 8340.

44. The applicable criteria for tenure are set forth in the Handbook for Faculty 1970. P. Ex 2. The areas which are evaluated in determining qualifications for promotion to a tenured position are (1) effectiveness as a teacher, (2) Research and scholarship, (3) professional stature and (4) service contributions.

An assistant professor at Pitt is normally appointed for three years. At the end of this period, he or she may be reappointed for a second term of three years. At the end of this second three year period, the assistant professor must be promoted to associate professor and receive tenure or employment is terminated. This is known as the "Up or Out System". See pp. 16, 17 Faculty Handbook. P. Ex. 2.

45. Tenure is not awarded simply on the basis of adequate performance of the criteria set forth in the Handbook. Tenure is not a matter of right but a privilege. The Faculty Handbook provides that a candidate must at least demonstrate outstanding accomplishment in some of the criteria for promotion and adequacy in the others. For example, both Dean Ebert and Dean Medearis testified that a poor teacher must be a truly distinguished investigator whose work is a stimulus to others in order to be promoted to tenure. Similarly, a faculty member with an average or less than adequate research record must make an outstanding contribution to the department teaching program or provide some other substantial and important departmental service. T. 1171 (Ramey); T. 6474 (Medearis); T. 10,744 (Ebert). See also T. 11,572 (Hayashi).

46. The evaluation and weighing of the various criteria for tenure depend upon the nature of the department. As set forth in the Handbook, the criteria for promotion are interpreted with differing emphasis depending upon the department. For example a clinical department such as pathology would place greater weight on service than preclinical departments such as biochemistry.

47. Dr. Heath's program for the department laid emphasis upon the importance of a quality teaching program and on the development of research oriented toward medical problems. Thus any individual's qualifications for tenure must be judged in light of that program. Inadequate teaching and research inconsistent with the department's goals are valid reasons for denial of tenure.

Dean Ebert of the Harvard Medical School expressly stated that it is important that a new chairman not be bound by the standards of the previous chairman if he is to fulfill the purpose for which he was recruited.

48. The fact that an individual's first three-year contract may be renewed for an additional three-year period does not indicate that that faculty member's performance is satisfactory or in accord with the long range goals of the department. Under the rules of the medical school, a non tenured faculty member must be notified in the second year of his first three year contract whether his contract will be renewed. Thus, the department chairman does not have a substantial opportunity to observe the performance of the faculty member or to assess his qualification; therefore the decision of the chairman to renew the appointment is of no particular importance. As stated by Dr. Youngner, a faculty mem-

ber barely has time to establish his research program or his presence in the department by the time the notice is required, so the appointment is almost automatically renewed in all cases.

49. During the period 1966–71, it was the practice in the medical school to notify a non tenured faculty member whether he would be promoted by March 15 of the second year of the second three year contract. During this same period the departmental chairmen in the medical school were responsible for making the initial recommendations regarding promotion. Although there was no requirement that the tenured faculty be consulted, Dean Medearis encouraged the department chairmen to seek the advice of the senior faculty in making tenure decisions.

Prior to the departmental decisions and recommendation to the Dean, whether made by the chairman alone or in consultation with the tenured faculty, there was no requirement, policy or practice in the biochemistry department or in the medical school to advise the faculty member that he was being considered for tenure, to request him to submit information in support of his or her candidacy or to solicit names of, or opinions from outside experts.

It was therefore not incumbent on Heath, absent due process considerations to inform plaintiff of consideration to be given her promotion and tenure. (Medearis 7444). As will be shown later no due process rights were involved in this case. The court is not prepared to require faculties making these determinations to give notice and grant hearings in all cases. The plaintiff in this case must have known that action on her promotion and tenure was imminent (8447). Chancellor Posvar stated (8368, 8446) that notice of the action taken should be given 1 year in advance and the practice in the medical school was to give it by March 15 of the preceding year.

50. If the departmental recommendation to the Dean is negative, no further action is required and the appointment of the faculty member is not renewed.

51. If the departmental recommendation to the Dean is favorable, the Dean then appoints an ad hoc committee to evaluate the faculty member's qualifications. Outside letters of recommendation are solicited by the ad hoc committee to assist in this process. An ad hoc committee is only appointed in the event that the Dean receives a favorable departmental recommendation. A favorable recommendation by the ad hoc committee is transmitted to the Executive Committee by the Dean and thence to the Vice Chancellor and Chancellor for final approval. The Chancellor has to review 200 to 300 tenure decisions a year and cannot possibly sit in on the deliberations but relies on the professional faculty.

52. In view of the procedure which must be followed in order to render a final tenure decision, the departmental decision must be made well in advance of the March 15 notification date to provide time, if the recommendation is favorable, for the convening of the ad hoc committee, the solicitation of outside letters, the deliberations of the ad hoc committee and the recommendations to the Executive Committee, Vice Chancellor and Chancellor.

### Meeting of Tenured Faculty—Consideration of Qualifications

53. Dr. Heath convened the tenured faculty on October 27, 1971 to consider the plaintiff's promotion, thereby allowing sufficient time to complete the tenure review procedure by March 15, 1972 should the tenured faculty recommend that the plaintiff be awarded tenure. Shortly after Dr. Heath's arrival at the university, both Dr. Basford and Dean Medearis had alerted Dr. Heath that he would be required to submit a recommendation concerning the plaintiff's promotion by March 15, 1972. P.I. 536, T. 2800 (Heath). In addition, Dr. Heath wanted to provide the plaintiff with adequate time to seek other employment in the event of an unfavorable decision. T. 2758 (Heath).

54. The tenured faculty consisted of Drs. Basford, Hofmann, Axelrod, Nakadà, Ihler and Heath. Dr. Basford did not participate in the deliberations because he was out of the country on sabbatical leave.

55. Consistent with departmental requirements, policies and practices, the plaintiff was not informed about the tenured faculty meeting to consider her promotion nor was she requested to submit information or the names of outside experts to the tenured faculty. In any event, the plaintiff testified that she knew that a decision concerning her qualifications for tenure had to be made during the 1971–72 academic year. T. 1369–74 (Johnson). Plaintiff was thus aware that by this time she should have developed the qualifications necessary for tenure. The procedure used in plaintiff's case was no different from the procedure used in any other tenure determination except that the tenured faculty participated and, if anything, was a fairer determination process since Dr. Heath sought the advice of the tenured faculty before submitting the departmental recommendation to the dean, something he was not required to do. Since the court holds there was no right to a due process hearing the failure to give notice is not important except as it may bear in the fairness of the consideration given plaintiff's promotion.

56. Several weeks prior to the meeting of October 27, 1971 Dr. Heath distributed a packet of materials relative to plaintiff to the members of the tenured faculty.

57. Prior to attending the meeting, Dr. Heath had reviewed the plaintiff's personnel file during the summer of 1971. Dr. Heath had also reviewed her 1971 NIH grant renewal application. T. 5771–5 (Heath). He was thus aware of the nature of plaintiff's research and of its lack of relevance to the mission of the department. He had concluded that she should not be given tenure but told no one of this conclusion.

58. At the meeting of the tenured faculty, Dr. Heath brought with him the plaintiff's curriculum vitae, a copy of her 1971 grant renewal application to the NIH and the preprints of her unpublished papers. At the meeting the plaintiff's qualifications were considered and evaluated in light of all of the criteria set forth in the Faculty Handbook. P. Ex. 2. See Plaintiff's Exhibit 9, the minutes of this meeting. Despite plaintiff's assertions, the court finds that her unpublished works were considered. Hofmann 10,118, Nakada 11,615, Engelmen 11,274.

The plaintiff has admitted that she was aware of the criteria in the Handbook. T. 1369 (Johnson). To the extent that in his letter to plaintiff of February 13, 1967 he attempted to vary them, Dr. Moldave did not have the authority to minimize the stated criteria for tenure and in fact he did not purport to do so in this letter (P. Ex. 1) where he explained that "unofficially" one of the most important factors in a tenure decision is research productivity and another was election to the American Society of Biological Chemists. In addition, Dr. Moldave did not promise the plaintiff tenure, either in his letter to plaintiff or at any other time.

59. Dr. Heath made no effort to influence the outcome of the tenured faculty meeting, expressing no opinion concerning Dr. Johnson's qualifications either prior to, or during the meeting, until all of the other tenured faculty had presented their own views. T. 3327, 3459 (Heath); T. 10,120 (Hofmann); T. 11,611, 11852 (Nakada). After careful consideration of all of the factors involved, the committee unanimously concluded not to recommend plaintiff for promotion to tenure. P.I. 671, T. 7348 (Ihler); T. 10,035 (Hofmann); D. Ex. 9. Dr. Basford did not vote on the question of plaintiff's promotion, owing to his absence from the university on sabbatical leave. He was however, informed of the outcome by Dr. Heath. (Heath P.I. 566) On page 3 of Dr. Basford's response to Dr. Heath (D. Ex. E) he indicated that he would have voted with the tenured faculty not to recommend plaintiff for promotion, although on page 2 he says he would have found it difficult not to support her promotion.

60. The tenured faculty discussed all aspects of Dr. Johnson's teaching activities including medical student teaching, both lectures and conference, graduate student teaching, duties as an advisor to graduate students and informal presentations such as Journal Clubs.

61. The evidence considered by the faculty at the meeting formed a sufficient

basis for evaluating the plaintiff's teaching performance. Dean Ebert of the Harvard Medical School testified that the most direct and valuable evidence regarding teaching is the opinion of those faculty colleagues who have witnessed lectures by the candidate. T. 10,741 (Ebert).

Dr. Myers testified that even a single lecture may suffice to evaluate teaching performance and Ebert, Finn and Park agreed that three or four lectures are clearly sufficient. Myers 8984, Finn 9633, Park 10,537, Ebert 10,741-2.

62. Student feedback is of limited utility in evaluating a faculty member since as to any given professor student comments will always vary from excellent to terrible (see Davies 10,195, et seq) however, continuing complaints by students may have some significance. T. 8985 (Myers). Therefore, it was appropriate for the tenured faculty to consider, in addition to their own observations, the students' complaints and the adverse student reactions to her lectures which they themselves had witnessed. It should be borne in mind of course that some courses are difficult but have to be taught. Schwartz 6819-21.

63. Based on all of the evidence, the tenured faculty unanimously concluded that Dr. Johnson's teaching was unacceptable. The minutes of the tenured faculty meeting of October 27, 1972 state:

"It was concluded by this group that Dr. Johnson has exhibited very limited expertise in her teaching assignments. In fact, just a month or so before this meeting was held, Dr. Johnson fulfilled her obligations to the medical student biochemistry course, the results of which were disastrous. During this teaching stint she demonstrated a virtually complete inability to organize and convey a substantive body of information to students. In fact, during one of her lectures, the student body became so frustrated with the confusion and lack of continuity that there was a boisterous and unruly revolt which achieved uncontrollable levels. In spite of this response, Dr. Johnson seemed incapable of grasping the significance of the deficiencies in her lectures. P. Ex. 9"

The conclusion of the tenured faculty concerning the plaintiff's ineffectiveness as a teacher is reasonable. Effective teaching of biochemistry in a medical school is very important. T. 10,191. The evidence indicates plaintiff's teaching was not effective. T. 10,668.

64. Dr. Heath made suggestions to the plaintiff regarding her teaching after her first lecture in 1971, the earliest opportunity available to him to observe her teaching. Dr. Heath concluded that plaintiff's presentation of the material in the first lecture was poor but his only suggestion was that she use roll away blackboards on which her formulae had been written in advance.

65. It is true that Dr. Johnson testified that she received no criticism of her teaching prior to 1971, but in view of the disastrous or inadequate lectures witnessed by them it was not unreasonable for the tenured faculty to consider this in reaching a decision.

66. The tenured faculty also considered and discussed plaintiff's research and scholarly productivity at the October 27, 1971 meeting. In connection with their evaluation of the plaintiff's research qualifications, they also considered the plaintiff's professional stature in the scientific community. The documents considered by the faculty were the plaintiff's curriculum vitae, her published papers, the three papers submitted for publication, and her 1971 grant renewal application to NIH, which contained a description of her research program for the next three years. T. 2777, 3315, 9015, 9025 (Heath); T. 11,813 (Nakada).

The faculty also was aware of Dr. Johnson's area of expertise and the research she was conducting in her laboratory through discussions with her and her presentations at Journal Clubs. (Johnson 350-353) The faculty was also aware of her other professional accomplishments, such as membership in the American Society of Biological Chemists.

This information provided a sufficient basis to evaluate the plaintiff's research and

**1344**

professional standing. The court finds that plaintiff's research was good but the faculty was justified in questioning its relevance to a medical school.

67. The tenured faculty's primary concern with respect to Dr. Johnson's research was its lack of relevance to biological systems in general and to biomedical problems in particular. All experts agreed that the research carried out in medical schools is basic, as opposed to applied, research; however, as Dr. Heath and others, including Dr. Mandel, pointed out, the research programs in a department of biochemistry in a medical school should most appropriately be directed toward the elucidation of biologically important problems.

The evidence shows some disagreement among biochemists as to what research is important, particularly in a medical school. For this reason the court cannot say that the conclusions of the tenured faculty were unreasonable. Certainly the court has no expertise in making this determination but has to rely on expert testimony.

68. Experts agree that plaintiff is a physical-organic chemist whose work is more suited to a chemistry department, in other words that her research may be outstanding but is not suited to the program of a medical school. This was a reasonable conclusion for the tenured faculty to draw. See also letter from Dr. Jencks D. Ex. 530. pp. 3287–8. Cerami 9467.

69. Both at the time she was hired and throughout the period of her employment at the medical school, plaintiff had actual and constructive notice of the kind of research which was expected of her as an effective and independent investigator in the department of biochemistry. Notice to change her research was not required where it did not fit the needs of the school. Medearis 8972–5.

70. The fact that plaintiff had received funding from the National Institute of Health (NIH) does not indicate that her research was of the type to warrant tenure at Pitt medical school or that such research was appropriate for a medical school department of biochemistry.

Also the fact that Dr. Heath signed the plaintiff's 1971 grant renewal application to the NIH does not indicate that Dr. Heath approved of the direction of the plaintiff's research. The department chairman was required to sign all grant applications prior to the time they were sent to the Dean. Dr. Heath in any event testified he would not have declined to sign plaintiff's grant application in any event, since grants are frequently transferred from one institution to another and it is advantageous to have a funded grant for this purpose. T. 2756 (Heath).

71. None of the studies based on the Science Citation Index, including the Lifetime Citation Index which was devised by Dr. Davies for the purpose of this trial, can be used to measure the quality of the plaintiff's research, either absolutely or in relation to other members of the biochemistry department and Dr. Diven, or to assess the importance of the plaintiff's work. The court finds that the reliability of this method in individual cases has not been shown. Cole 11,368.

72. Dr. Johnson also attempted to establish that she was conducting research concerning sickle cell anemia in 1971. However, plaintiff produced no evidence of such experiments and, in fact, admitted that, at most, she had done only certain mathematical calculations of linear free energy relationships. The experts indicated that her work had no apparent relationship to sickle cell research.

73. The members of the tenured faculty are all expert biochemists who are qualified to judge the character and quality of plaintiff's research. Based upon their knowledge of biochemistry, the tenured faculty at their October 27, 1971 meeting concluded that plaintiff's research was not relevant to biomedical problems. P.E. 9. The court finds this conclusion was not unreasonable. In order to be absolutely fair to plaintiff, however, Dr. Ihler suggested at the conclusion of the meeting that outside experts be consulted to determine whether plaintiff's work was considered to be outstanding by experts within that particular narrow field of research. T. 7328–38 (Ihler). The members of the tenured faculty indicated that if

they had been advised that plaintiff's research was truly outstanding in its field, they might have been willing to reconsider their evaluation of her research, even though they believed her work to be only remotely related to biomedical problems.

74. Pursuant to Dr. Ihler's suggestion, on October 27, 1971, the same day as the tenured faculty meeting, Dr. Heath wrote to Dr. Robert Abeles, an internationally known bio-organic chemist in the area of coenzyme chemistry who had previously recommended the plaintiff for membership in the American Society of Biological Chemists, and Dr. Nathan Kaplan, an international expert in the field of pyridine nucleotide coenzymes. P. Ex 1940, 1941. In his letter to them, Dr. Heath described the tenured faculty's evaluation of plaintiff's performance as a faculty member to provide them with the factual background. He requested that the experts review the plaintiff's research qualifications without regard to the other criteria for tenure. Both Dean Ebert and Dr. Cohen testified that it was not inappropriate to provide background information to these experts and, in fact, each testified to having received such letters themselves. T. 10,262, 10,749. The court finds it was appropriate to check with these gentlemen under the circumstances.

75. The responses of Dr. Abeles and Dr. Kaplan did not contain information sufficient to cause the tenured faculty to reconsider its evaluation of plaintiff's research. The experts failed to characterize the research published by plaintiff during her four and one-half years at Pitt as outstanding excellent or significant. Dean Ebert characterized the letters as "lukewarm". (10,749–50).

Experts with long experience in evaluating letters of recommendation concurred in Dr. Heath's conclusion that the responses of Drs. Abeles and Kaplan would not cause the tenured faculty to reconsider their evaluation of plaintiff's qualifications for tenure since the recommendations were lukewarm at best. Dean Ebert commented that Dr. Kaplan's letter was, in fact, rather critical of the plaintiff and Dr. Cohen found it significant that Dr. Abeles confessed himself unable to make up his mind regarding the plaintiff in view of some serious reservations he had about her work. Under the circumstances the court finds it was not unreasonable to adhere to prior decision.

76. Dr. Heath discussed the responses received from Drs. Abeles and Kaplan in late November 1972 with all the members of the tenured faculty, except Dr. Hofmann who was out of the country at the time. T. 2981 (Heath); T. 10,121 (Hofmann). It was the conclusion of the tenured faculty that the experts' assessment of plaintiff's research did not differ from their own evaluation. T. 2981 (Heath); T. 11,615 (Nakada).

77. It was inappropriate for Heath to suggest to plaintiff that she change the direction of her work and as a practical matter, such a suggestion would have been futile since there would not have been sufficient time for the plaintiff to change the direction of her research before a decision concerning her promotion was due to be made. In fact, even another year would have been insufficient since, as various experts testified, such changes in research direction are difficult, requiring two or three years and additional training, even where the investigator voluntarily elects to make the change.

78. Based on their consideration of all the information available to them, the tenured faculty concluded that plaintiff's research was adequate but was in the area of organic chemistry rather than biochemistry and was neither exciting nor relevant to the mission of the department. P.I. 62 (Axelrod). The court determines this was a reasonable conclusion.

79. The tenured faculty also considered plaintiff's other contributions as set forth in the Faculty Handbook. The evidence indicates they were not sufficient to justify a grant of tenure or to outweigh the other considerations previously mentioned.

80. Based on consideration of all the factors set forth in the Faculty Handbook, the tenured faculty concluded unanimously that the plaintiff not be promoted to tenure.

Both plaintiff's and defendants' experts agree that tenure is a privilege and not a

right, even when a person is qualified. The university is not a haven for faculty but rather an institution designed to generate and transfer knowledge, and its needs prevail over the needs of the individual in deciding whether to promote. When tenure is considered in light of this purpose and in light of the fact that it involves a long term fiscal commitment by the university to a faculty member when funds are as here limited, it is apparent that the decision is most effectively made within the university and that a well informed decision can only be made by the colleagues with whom the faculty member has worked. Thus, the peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution. See Posvar 6667–70. The court concludes the decision was reasonable.

### Administrative Review of the Decision

81. Dr. Heath testified that the decision of the tenured faculty was not immediately communicated to the plaintiff, pending receipt of the responses from Dr. Abeles and Dr. Kaplan. The final response did not arrive until late November or early December and Dr. Heath therefore decided to postpone notifying Dr. Johnson of the negative tenure decision until after the holidays. She accidentally learned of the decision during a Christmas party. The plaintiff met with Dr. Heath in his office after a faculty meeting on January 6, 1972, and he informed her of the departmental decision and the reasons therefor, particularly her poor teaching performance, the direction of her research and its lack of relevance to the mission of the department. P.I. 88–9 (Johnson).

82. The record would not have been any different regarding plaintiff's status if Dr. Heath had made the decision unilaterall as he had the right to do since he would still have been obliged under university procedures to notify the dean of his decision as he did and he would have been compelled to be candid about plaintiff's prospects for promotion when such information was sought by prospective employers.

University procedures at the time of the negative tenure recommendation provided that a faculty member who was dissatisfied with the departmental recommendation could request that the dean of the medical school review the decision. If the faculty member were still not satisfied, he could then seek review by the Vice Chancellor and the Senate Academic Freedom and Tenure Committee. T. 2168 (Blakely); T. 2874 (Heath). Final recourse for an aggrieved faculty member was to the Chancellor. The By Laws of the university provide a procedure whereby the chancellor may, in his discretion, appoint a trustees' committee to investigate the faculty member's charges of unfair practices with respect to the terms and conditions of his employment, including the failure to reappoint. T. 3779, 3782 (Cheever); T. 4251–5 (McEvilla); P.E. 20.

83. On January 11, 1972, plaintiff discussed with Dr. Grace Gregg, the affirmative action officer of the medical school her dissatisfaction with the departmental tenure recommendation. T. 514 (Johnson). Dr. Gregg explained to Dr. Johnson that under the university guidelines then in effect, she had no responsibility for pursuing the grievances of faculty members, but she said she would discuss the matter with Dean Medearis. Dr. Gregg also advised the plaintiff to seek a meeting with the dean. On the same day, Dr. Gregg sent a letter to the dean requesting to meet with him to discuss the plaintiff's grievance. Immediately thereafter, Dean Medearis met with Dr. Gregg and she related to him plaintiff's claims that sex discrimination may have been involved in employment decisions in the biochemistry department. Dean Medearis told Dr. Gregg that he would be happy to meet with the plaintiff to discuss her allegations if the plaintiff would arrange for an appointment.

Dr. Gregg reported to Dr. Johnson that Dean Medearis was willing to discuss the matter and she advised the plaintiff to make an appointment with the dean. Plaintiff was unable to meet with Dean Medearis until March 24, 1972.

84. Upon receipt of letter from plaintiff on March 13, 1972, Dean Medearis directed his secretary to set up a meeting with the plaintiff, which was first scheduled for March 18 and then for March 22. Prior to the meeting, he received a letter from counsel for plaintiff. Dean Medearis then sought advice from his superiors and was advised by university counsel not to meet with plaintiff's lawyers unless university lawyers were also present. Based upon this advice, he called to inform plaintiff that he could either meet with her alone or that counsel for both parties would have to be present, requiring a postponement in order to brief university counsel. He told plaintiff that if her lawyers were present he would have them dragged out by the police. P.I. 116. Plaintiff then suggested that she and Dean Medearis meet in the presence of another faculty member, Dean Medearis agreed and the meeting was held on March 22 in the presence of Dr. McLain, a faculty member selected by the plaintiff.

85. At the meeting, the Dean and Dr. Johnson discussed the tenure decision, possible solutions to the problem and the available procedures for challenging the decision.

86. Subsequent meetings were held in March and April among Drs. Medearis, Johnson, McLain and Heath at which various alternatives were discussed. T. 2813–3 (Heath); T. 6507 (Medearis) Dr. Medearis and Heath indicated their willingness to consider an alternative non tenure stream appointment for plaintiff in lieu of termination. Plaintiff, however, consistently refused to negotiate, insisting upon promotion with tenure. T. 2804, 8848 (Heath); T. 6554 (Medearis).

87. Subsequent to April 15, the plaintiff had a second meeting with Dr. Blakely during which he advised her to contact the Senate Academic Freedom and Tenure Committee and the Vice Chancellor's office. He also informed her of her right to file charges with the EEOC stating that the university would welcome such an investigation, and provided her with the appropriate forms. T. 517 (Johnson); T. 2168, 2189, 2253 (Blakely).

88. On April 20, 1973, Dr. Johnson filed a complaint with the Senate Academic Freedom and Tenure Committee (SAFT). (Johnson). This committee is charged with the responsibility of investigating grievances or complaints against the university. The committee reviewed the documentation submitted and met with both plaintiff and Dr. Heath.

Based on their investigation, the committee was satisfied that the procedures followed were proper and that plaintiff had not been denied due process. T. 4200 (McEvilla). The SAFT Committee also found that the tenured faculty had not erred in concluding that plaintiff was not qualified for tenure T. 4266 (McEvilla). Dr. McEvilla specifically stated that the committee did not find any evidence that Dr. Johnson had been discriminated against. T. 4266 (McEvilla). Because of the plaintiff's allegations of a declining number of women faculty in the department, however, the committee suggested that her general charges of sex discrimination in the Department of Biochemistry be investigated.

89. The By Laws of Pitt provide that a faculty member aggrieved by failure to reappoint may request a special review committee composed of other faculty members and one or more trustees. D. Ex. 43. It was within the Chancellor's discretion whether to grant the hearing.

90. On July 27, 1972, the plaintiff wrote to Dr. Posvar, requesting appointment of a Chancellor's committee to review her grievance. She did not set forth the particulars of her claim in this letter. T. 2278 (Blakely); P.E. 986. Upon receipt of the letter, Dr. Posvar asked his staff to prepare a proposed procedure for the hearing. T. 8332–5 (Posvar). On August 14, 1972, Dr. Blakely notified plaintiff that her request had been received and that the matter was being reviewed. T. 2189–92 (Blakely); P.E. 1264. In a memorandum to the Chancellor dated September 7, 1972, university counsel, James Wolf, reported the results of his review of the procedures followed in the plaintiff's case. P.E. 715.

91. Since such a review committee had not previously been convened, it was neces-

sary to discuss the procedures to be followed with the Faculty Senate. The matter was raised with the Senate, at the September 1972 meeting and applicable procedures were agreed upon. It was determined that the procedure was to be based on AAUP guidelines and that the committee would be composed of two Trustees, Judge Harry Kramer of the Pennsylvania Commonwealth Court and Alice Chauss and four Faculty Senate members left from an original panel of 12 after both sides had exercised their right to strike. In December 1972 the Chancellor offered plaintiff the right to have her charges heard by a review committee constituted as mandated by the Faculty Senate.

Two weeks later, plaintiff's counsel declined the proffered hearing on the ground that the procedures were unacceptable. Mr. Wolf sent copies of the proposed procedures to plaintiff's counsel and attempted to persuade her that the AAUP rules of procedure were adequate, but plaintiff steadfastly refused to accept the Chancellor's offer and filed suit shortly thereafter on February 8, 1973.

92. The plaintiff was justified in refusing to accept the Chancellor's offer of a hearing because the committee was to hear only the charges of sex discrimination and first amendment rights. The Chancellor reserved to himself the right thereafter to decide her qualifications for tenure.

93. Considering sex discrimination statistics alone, it would appear that some sex discrimination was operating in the medical school at Pitt during the time of the decision on plaintiff's promotion and tenure. As noted in the memorandum accompanying the preliminary injunction of 401 faculty members in the school only 5 women had tenure, 6 departments had no women faculty at all, only 3 had women with tenure. The average salary for male tenured professors was $37,500 while that for women with tenure was $27,000. Women's salaries in 1972 averaged 69.4% of men's, in 1973, 67.1% and 1974 66.0% (Gardner 7957–8). There were four times as many women eligible for tenure on this faculty as men. During the preceding six years, 70 men had been given tenure as compared to 3 women.

Further evidence at the trial on the merits showed that in September 1973 in the pre-clinical departments of 89 males 50 had tenure, while of 11 females, 2 had tenure (De Carni T. 7883) 10 out of 13 males in the biochemistry department were in the tenure stream but only 2 out of 8 females were in the tenure stream. 45% of males in the tenure stream achieved tenure, but only 6% of the women. (Gardner 7951)

These facts indicate on their face a prima facie case of sex discrimination.

On the other hand, the causal connection between these figures and the decision with respect *to this individual plaintiff* has not been shown. DeGroot 11,121–28.

There was no substantial difference between the salary paid plaintiff and that paid comparable males. (LiVolsi 10,956; See P. Ex. 106)

94. The plaintiff herself testified that Dr. Heath never refused to meet with her and never prevented her from speaking out at faculty meetings. T. 1453, 1500 (Johnson). The plaintiff's husband testified that the plaintiff never mentioned instances of Dr. Heath's "shunning" her although she complained that others did so. T. 7233 (J. Johnson).

95. From 1972 to 1975, the plaintiff engaged in activities which might justifiably provoke a reaction from the defendants. She badgered Dr. Heath and Dean Medearis with numerous certified letters relating to trivial administrative details and behaved inappropriately at faculty meetings. Her ostentatious behavior in taking attendance at Journal Clubs, taking notes of faculty meetings and memorializing all incidents by certified letter was inhibiting to the other members of the faculty.

The plaintiff's attitude is best demonstrated by her own comments. She distributed unflattering caricatures and made crude remarks in public reflecting on the character of the individual defendants, referring to them as "male chauvinist pigs".

While her comments might be considered protected free speech, nevertheless they

could not but provoke a clash of personalities. They certainly had nothing to do with the original decision of October 27, 1971.

Finally, plaintiff's purpose was clearly revealed in her comment to Isobel Hunter in the Fall of 1972 that she was "having great fun harassing the Dean".

While defendant previously denied this remark, the court finds it true. There is no evidence that any of the defendants made comments such as those made by the plaintiff. Nevertheless the evidence indicates a clash of personalities between plaintiff on the one hand and Heath and Medearis on the other.

96. There was prima facie evidence of sex discrimination in the department of biochemistry or the school of medicine as set forth in the findings in connection with the preliminary injunction, but defendant has refuted this at the trial on the merits by the weight of the evidence. There is evidence that both in the department of biochemistry and the medical school as a whole very few women were given tenure and promoted to associate professor as compared to large numbers of men, but the court finds after considering defendant's evidence that sex discrimination did not play a part in consideration of plaintiff's qualifications for promotion and tenure.

97. In June 1970, the Board of Trustees adopted a resolution reaffirming the university's commitment to equal opportunities for all individuals regardless of sex.

Also, in 1970, the Office of Contract Compliance issued a show cause order to the university as a government contractor requiring affirmative action plans under Executive Order 11246. The university complied by submitting its Affirmative Action Plan in November, 1970. At the time of hearing on the preliminary injunction the medical school had done little to remedy the imbalance between men and women on the faculty and as a matter of fact after two years less women were employed.

98. The medical school was successful in its efforts to increase the number of women faculty while this suit was pending. From 1972 to 1975, the number of women faculty at every rank increased at a significantly greater rate than the number of male faculty.

99. While formal authority resides in the Board of Trustees to run the University of Pittsburgh, it has delegated the management and actual day to day operations of the university to the Chancellor, reserving to itself the responsibility to establish broad, overall policies. The Board is kept informed of the operations of the university through reports from the Chancellor and his staff.

The trustees have no duty to supervise the day to day activities of the university or to become involved in personnel decisions affecting the more than 6,000 employees, including the 200–300 tenure decisions every year. There is no evidence that the trustees have ever become involved in specific faculty appointments or tenure decisions, nor should they do so. The trustees are not competent to determine whether a particular faculty member is, or is not, qualified for tenure. The trustees are not compensated for their service to the university and, in addition, have full time careers in highly responsible positions outside the university.

100. The clinical significance of any disproportion cannot be determined statistically. Rather, as Dr. DeCani testified, (7931–2) persons with knowledge of biochemistry and of the qualifications for promotion would have to make that determination to equalize all of the factors so that a conclusion could be drawn. Since the factors involved in determining achievement of professional accomplishment are subtle and subjective, they would be difficult to study by statistical analysis.

Thus, while statistics may be useful in some cases in elucidating sex or race bias, this is not an appropriate case to make a final decision based on such statistics because it is impossible to equalize the qualifications of all candidates. This is very different from cases where the only qualification is a physical examination, for example. T. 11,171 (DeGroot). In addition, the very

small numbers involved with respect to the medical school and the biochemistry department render the statistical figures highly unreliable. T. 11,128, 11,196 (DeGroot).

### State Action and Claims Under 42 U.S.C. §§ 1983 & 1985(3)

101. For the purposes of determining the plaintiff's claims under 42 U.S.C. § 1983, the court adopts the findings of Judge Sorg of this court in *Braden v. University of Pittsburgh*, 392 F.Supp. 118 (W.D.Pa.1975). The remaining facts with respect to plaintiff's claims under 1983 and 1985(3) are set forth in Part B of the discussion to the extent not included in findings 1–100 herein.

## III. DISCUSSION AND OPINION

### A. *Preliminary.*

This is a double barrelled suit brought under 42 U.S.C. § 2000e forbidding sex discrimination and under the Civil War Civil Rights Acts 42 U.S.C. §§ 1983 and 1985(3). In the first instance as noted this court on May 31, 1973 had issued a preliminary injunction determining that plaintiff had established a prima facie case of sex discrimination under Title VII and also a denial of equal protection under 1983. The court also found irreparable harm unless the status quo was preserved, that no substantial hardship to defendant would result from issuance of a preliminary injunction to preserve the status quo until the case could be fully tried upon the merits. Since a preliminary injunction is heard in haste before the parties have fully developed their discovery a full trial on the merits may cast an entirely different light upon the whole situation. The main purpose of the preliminary injunction was to maintain the plaintiff in her then job pending final determination of the whole issue. A preliminary injunction by its very definition is subject to change after the merits have been more fully developed and the court has an opportunity for more mature deliberation. It is also apparent that since May 31, 1973, the thought in this area has been more fully developed by decisions of the various courts relative to the application of the 1972 amendments to the Civil Rights Act hereinafter mentioned which first included universities such as this defendant on March 24, 1972. See *Railroad Yard Masters v. Penna. RR Co.*, 224 F.2d 226 (3d Cir. 1955).

In the recent case of *Glasco v. Hills, Secretary of HUD*, 558 F.2d 179 (3d Cir. 1977) the court referred to the limited review of a preliminary injunction "because the grant or denial is almost always on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief."

No appeal was taken by the defendant from the issuance of the preliminary injunction.

The court further recognizes that this has been a most difficult case because we are dealing to a considerable extent in matters of abstruse scientific knowledge in which the court has little or no expertise and we must therefore rely on experts as in any other matter where the finder of fact needs help in a particular field of advanced human knowledge. Also, many of the factual problems and findings of fact in this case must be solved and determined as matters of inferences derived from the nuances of testimony of the persons involved and the experts. Questions of motives and intent must be gleaned from the conduct of learned professors, and we must always bear in mind that as in any civil case the plaintiff has the burden of convincing the trier of the facts (in this case the court) by a preponderance of the evidence.

The court is further aware that this case has attracted considerable public attention, particularly among the organizations advancing the cause of women's liberation. We need not characterize the plaintiff as envisioning herself a modern Jeanne d' Arc as the plaintiff was termed by the Second Circuit in *Faro v. N.Y.U.*, 502 F.2d 1229 (2d Cir. 1974) to recognize that the case is regarded by many as a test of the rights of

female professors to gain tenure and promotion in academia under Title VII. This is regarded as one of the bastions of male chauvinism.

It further should be observed that we do not have in this case the obdurate problem of the *Braden* case presently pending in this district with respect to state action under 42 U.S.C. § 1983. *Braden* is a suit (class action sought but not certified) by a female professor in the school of Dentistry at the University of Pittsburgh who did not achieve tenure and promotion based on events which occurred before the effective date of the 1972 amendments to wit: March 24, 1972 and hence is based solely upon the Civil Rights Acts of 1866 and 1870. While the instant case also is brought under 42 U.S.C. § 1983, it has also been determined that Title VII of the Act of 1964 with its educational amendments is applicable thereto. See *Braden v. University of Pittsburgh* where the complaint was first dismissed 343 F.Supp. 836 (W.D.Pa.1972) whereupon the court of appeals vacated and remanded the same. (*Braden I*, 477 F.2d 1 (3d Cir. 1973). Upon rehearing on motion to dismiss Judge Sorg of this district held there was sufficient state action to process the case under 1983 and the circuit (*Braden II*) affirmed 552 F.2d 948 (3 Cir. 1977) and remanded the matter for trial on the merits. For Judge Sorg's second decision see 392 F.Supp. 118 (W.D.Pa.1975). In the preliminary injunction decision, *Johnson v. University of Pgh.*, supra, this court did hold that Title VII of the 1964 Act was applicable after a preliminary skirmish as to the applicability of the educational amendments of 1972 since the discharge of Johnson would not take effect or become final until June 30, 1973. Since then other courts have come to the same conclusion and there is therefore no necessity to pursue this matter further. *Cf. Weise v. Syracuse University*, 522 F.2d 397 (2d Cir. 1975); *Cussler v. Univ. of Md.*, 430 F.Supp. 602 (D.Md.1977); *Rackin v. Univ. of Penna.*, 386 F.Supp. 992 (E.D.Pa.1974).

Again, it should be observed that this is not a class action but is a suit brought by an individual in her own right. A class action would have injected a veritable galaxy of other problems into the case which is complicated enough as it is. It was further observed that the plaintiff while perhaps having a right to jury trial with respect to claims for damages under 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3) waived jury trial so that the whole matter is before the court non jury for decision including both Title VII and 1983.[1] As a result, the court has been able to hear the case at intervals without disrupting its calendar for more than four solid months as would have been required in the case of a jury trial.

B. *Cause of Action Under Title VII.*

Title VII of the Civil Rights Act of 1964 insofar as is relevant here provides in Section 703 (42 U.S.C. § 2000e–2)

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

In 42 U.S.C. § 2000e–5(g) (Section 706 of the act) it is provided:

"No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended or ex-

---

1. The trial of an action such as this under Title VII is de novo and without jury. See *Wetzel v.*

*Liberty Mutual Insurance Co.*, 511 F.2d 199 (3d Cir. 1975).

pelled, or was refused employment or advancement or was suspended or discharged *for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation* of section 2000e–3(a) of this title."

It is further provided in 42 U.S.C. § 2000e–3(a) as follows:

"(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he had opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

Pursuant to 42 U.S.C. § 2000e–5 the plaintiff in this case filed a complaint with the Equal Employment Opportunity Commission which after investigation sustained the complaint indicating there was probable cause. The plaintiff thereafter duly brought suit in this court charging the unlawful employment practice of sex discrimination. The processing and trial of the case has been delayed by extensive discovery proceedings, extensive wranglings with respect to the same and the necessity of fitting the 74 days of trial into the interstices of the court's other schedules including that devoted to speedy trial for criminal cases and there was also delay because the attorney for the plaintiff was engaged in the trial of a similar case in the District of Maryland (*Cussler v. University of Maryland*, 430 F.Supp. 602).

In a non-class action case of this kind the guidelines for the path to be followed by the court are clearly laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) where the court said:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

The court further said 411 U.S. at page 802–803, 93 S.Ct. at page 1824, 36 L.Ed.2d at page 678:

"The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for a refusal to hire. Here petitioner has assigned respondent's participation in unlawful conduct against it as the cause for his rejection. We think that this suffices to discharge petitioner's burden of proof at this stage and to meet respondent's prima facie case of discrimination."

The third step is set forth in *McDonnell Douglas* as follows:

"Petitioner's reason for rejection thus suffices to meet the prima facie case, but the inquiry must not end here. While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand, respondent must, as the Court of Appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the 'stall-in' were nevertheless retained

or rehired. Petitioner may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races."

■ While *McDonnell-Douglas* was a race discrimination case, non-class action, nevertheless the same guidelines apply to sex discrimination cases since race and sex are proscribed in the same sentence of § 703(a)(1) and (2).

See *Ostapowicz v. Johnson*, 541 F.2d 394 (3d Cir. 1976), where the court said:

"The defendant contends that the district court erred in allocating the burden of proof and argues that plaintiff failed to prove sex discrimination or to rebut the company's articulated justifications. After careful review of the district court's opinion incorporating findings of fact and conclusions of law, we do not find reversible error.

"The court cited *McDonnell Douglas Corp. v. Green*, supra, and carefully followed its guidelines in ruling on burden of proof at various stages of the case. The *McDonnell* case holds that once a prima facie case of a Title VII violation has been established, the burden shifts to the defendant to articulate legitimate nondiscriminatory reasons for the unequal treatment shown in the prima facie case. The defendant must prove its justification by a preponderance of the evidence."

The court holds in the instant case that (1) plaintiff made out a prima facie case of a Title VII violation, (2) the defendant then articulated by a preponderance of the evidence legitimate, nondiscriminatory reasons for the treatment of the plaintiff shown in the prima facie case, (3) the plaintiff did not prove by a preponderance of the evidence that the stated reasons for plaintiff's rejection for promotion and tenure were pretextual.

■ It will be noted that the court in granting a preliminary injunction in this case determined plaintiff had made out a prima facie case of sex discrimination.

*Johnson v. University of Pittsburgh*, 359 F.Supp. 1002 (W.D.Pa.1973). The proceedings on the preliminary injunction were incorporated by reference in this case as part of the record pursuant to Rule 65. The plaintiff proceeded with the presentation of a mass of evidence some of which was an attempt to strengthen the prima facie case which the court held she had already proved in the preliminary injunction proceeding and another large amount was an apparent attempt to show that the reasons presented by the defendants for the action were pretextual although this would more properly be a matter for rebuttal. In view of the fact that many witnesses were testifying on both aspects of the plaintiff's presentation it appeared to the court that this procedure should be followed since otherwise the witnesses would have to be called back twice and many of them came from a great distance. The result however was a blurring of the two parts of plaintiff's case under *McDonnell-Douglas*. In any event, the defendant went on to present a mass of evidence which in the opinion of the court carried its burden of showing a justification for the action taken by a preponderance of the evidence.

1. The Court Is not a Super Tenure Committee to Pass on Qualifications for and Grants of Tenure in Colleges and Universities

■ We start with the proposition that tenure is a privilege, an honor, a distinctive honor, which is not to be accorded to all assistant professors. It is a very high recognition of merit. It is the ultimate reward for scientific and academic excellence. It is to be awarded in the course of search for fundamental merit. See Posvar 8338, 8340 and 8374. Such decision by its very nature cannot be made by a court but must be made by the faculty, the administration and trustees of the university. See the late Chief Judge Sheriden in *Keddie v. Penn State University*, 412 F.Supp. 1264 (M.D.Pa. 1976), *Faro v. N.Y.U.*, 502 F.2d 1229 and *Cussler v. University of Maryland*, supra, which involved a new department head brought in to strengthen a weak department.

The Court of Appeals for the Second Circuit in *Faro* had this to say

"Of all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision. Dr. Faro would remove any subjective judgments by her faculty colleagues in the decision-making process by having the courts examine 'the university's recruitment, compensation, promotion and termination and by analyzing the way these procedures are applied to the claimant personally' (Applt's Br. p. 26). All this information she would obtain 'through extensive discovery, either by the EEOC or the litigant herself' (Id.). This argument might well lend itself to a reductio ad absurdum rebuttal. Such a procedure, in effect, would require a faculty committee charged with recommending or withholding advancements or tenure appointments to subject itself to a court inquiry at the behest of unsuccessful and disgruntled candidates as to why the unsuccessful was not as well qualified as the successful. This decision would then be passed on by a Court of Appeals or even the Supreme Court. The process might be simplified by a legislative enactment that no faculty appointment or advancement could be made without the committee obtaining a declaratory judgment naming the successful candidate after notice to all contending candidates to present their credentials for court inspection and decision. This would give 'due process' to all contenders, regardless of sex, to advance their 'I'm just as good as you are' arguments."

Again in *Peters v. Middlebury College*, 409 F.Supp. 857 (D.Vt.1976), the court pointed out that a professor's value cannot be measured by objective standards and went on to say:

"An evaluation of one's teaching ability is necessarily a matter of judgment.

" 'A professor's value depends upon his creativity, his rapport with students and colleagues, his teaching ability, and numerous other intangible qualities which cannot be measured by objective standards. *Lewis v. Chicago State College*, 299 F.Supp. 1357 (N.D.Ill.E.D. 1969).'

"These considerations have induced reluctance in the courts to override the 'rational and well-considered judgment of those possessing expertise in the field.' *Green v. Board of Regents of Texas Tech. University*, 335 F.Supp. 249, 250 (N.D.Tex. 1971), aff'd, 474 F.2d 594 (5th Cir. 1973). Absent an impermissible discrimination, the federal courts will not intrude to supervise faculty appointments and tenure. *Faro v. New York University*, 502 F.2d 1229 (2d Cir. 1974); *Lewis v. Chicago State College*, supra."

In *Peters* as in the instant case the court determined that the evidence presented by the plaintiff constituted a prima facie case but then held that the reasons given by the institution for non promotion showed that by a preponderance of the evidence she was not professionally qualified for tenure and that the reasons given were not pretextual, and that there was substantial evidence to show that plaintiff's teaching was not satisfactory. See also *Mosby v. Webster College*, 423 F.Supp. 615 (E.D.Mo.1976) finding that there had been a good faith judgment that plaintiff did not meet the standards of the college for the job in her performance as a teacher; and *Labat v. Board of Higher Education of N.Y.C.*, 401 F.Supp. 753 (S.D.N.Y.1975) pointing out tenure is a life contract to age 70 and of great significance to the candidate as well as the university and that such decisions are least suited for federal court supervision.

Plaintiff has pointed to no case in the federal system in a proceeding under Title VII where the court has ordered a college professor to be promoted and be given tenure over the judgment of the professionals in academia. The principles above cited are recognized unanimously by all the courts, with the qualification of course "absent impermissible sex discrimination".

■ The federal courts cannot of course allow the faculty or university administra-

tion to use facially proper criteria for promotion and tenure to be used as window dressing to disguise what is actually a case of invidious sex discrimination. To do so would completely wipe out the provisions of the act of Congress in this field which Congress has expressly mandated to be applicable to appointments in educational institutions. We hold in this case however that the defendants have presented substantial reasons for the failure to promote plaintiff to the rank of associate professor and give her tenure and that plaintiff has not shown by the weight of the evidence that such reasons are so insubstantial and irrational as to serve as a mask for what is forbidden by the law.

It is also, true however, as elucidated by *McDonnell Douglas Corp. v. Green,* supra, quoting from *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) that:

"Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."

As a matter of fact it is set forth in the act, 42 U.S.C. § 2000e–5(g), that the Civil Rights Act of 1964 was not to be used for the purpose of requiring employers to employ or promote unqualified persons. We will turn next to determine if such impermissible influences operated here.

2. Criteria for Promotion & Tenure at the University of Pittsburgh

As previously noted the granting of tenure with the accompanying rank of associate professor is a serious matter for the university since as stated by Chancellor Posvar this involves a long range financial and academic commitment by the university to the individual. See Chancellor Posvar at pages 6667–71 where he stated:

"Having looked at sort of the pros and cons, I am moved to say about that particular kind of recommendation that there is never, in a tenure decision, any objective standard that indicates good or no good. It is always a subjective standard and it is a decision always made on merit weighed against the needs of the department and weighed against, if you will, the financial capacities of the department and the school.

"There being no objective standards, there is also no right to tenure. About half of our candidates for tenure, that is assistant professors who are candidates make tenure at our university and half who don't make it are very, very disappointed. But we have to maintain the position that there is no objective or vested right of any candidate to a form of job security that would entail a mild obligation of the trustees over the next 30 years.

"So, every possible test of selectivity of limitation is applied and I would have to say that in these cases, in effect, the burden of proof is on those who want to appoint a person and the doubts about capacity, the doubts about need tend to weigh against the candidate because it is a very highly selective kind of appointment.

"I would like to stress, again, that this is not a matter of due recognition of excellence or value of a person as a researcher or investigator. It just simply means that a given person, and I am not speaking of this case, I am speaking of cases in general of tenure, it means that a given person at a given time in a given department did not fill a particular set of needs.

"Some very great men and women and scholars and others have not received tenure.

"I can think of one, one of the greatest scholars in America today who did not receive tenure at Harvard and who might possibly be the next Secretary of State. I think that the fact that that particular person didn't receive tenure at Harvard puts him in a class with thousands of other outstanding individuals in America who did not get tenure at a given place at a given time.

"Q. You don't know of any distinction between Harvard's policies on tenure and such an institution as the University of Pittsburgh?

"A. There is this distinction. Harvard has, unlike most other universities, a fixed numerical allocation, if you will. There are designated tenure chairs.

"Now, that number is inflexible in a given department you know, there may be 12. No more. And so, the assistant professors compete for only the vacancies that exist.

"The criterion at the University of Pittsburgh and most large universities is much more flexible in that there are not a limited number of slots. There is more judgment exercised in a more flexible way as to merit versus availability, resources versus the technical needs of the department at the time.

"We are moving, however, I think all of us will be moving more and more in the next 20 years toward a fixed definition of tenure positions because financially, we will have to.

"Q. Let me ask you, sir, a matter that has come up in this case and other cases involving universities.

"It is known as the up or out system. If you don't make tenure and associate professor by a certain—after a certain number of years, you are out.

"A. We have had that. That appears to be a more or less inflexible policy but nobody else, nobody yet, has explained the reason for it.

"Q. I can maybe see an obvious reason but I don't think we have anything on the record about it.

"Do you care to say anything about that?

"A. Well, that's a more unpleasant way of describing the tenure appointment process.

"The appointment to a fixed term, which you might call not a probation but simply a fixed term, as an instructor or assistant professor. The term lasts sometimes three years, well, usually, I guess, six years. It runs around six years, six or seven years with the decision on merit to be made at the end of that time, merit versus the needs of the department, involving selectivity is, in effect, the up or out.

"If you don't get promoted to tenure, to associate professor, your period of employment ends. The contract ends. The term ends. The system is meant to serve the goal of tenure as a device for preserving academic freedom. In my view, the only true justification for tenure is to secure the professor against criticism or job insecurity for speaking out or saying whatever he or she wants to say controversially.

"We have some very controversial people on our faculty who are very well protected by their tenured appointment at this time. Because it is such an extraordinary privilege in our society involving such extraordinary reward and security, it is highly sought after and it is highly selective."

The criteria are specifically set forth in plaintiff's exhibit 2 the faculty handbook for the University of Pittsburgh which incidentally on its face shows The University of Pittsburgh of the Commonwealth System of Higher Education". It is stated "The University has established the following criteria as a guide in evaluating candidates for appointment and promotion and for the development and review of recommendations for advancement. These criteria were adopted after extensive discussion within the university's faculties and schools." Then follow the four factors to be considered each one of which contains numerous subfactors to be evaluated in determining the main factor itself:

(a) Effective as a Teacher (b) Research & Scholarship (c) Professional Stature (d) Other Contributions.

See Faculty Handbook P. Ex. 2 pp. 19–21. It is obviously true though, that the handbook may contain facially proper criteria and yet be used by individuals as a mask for disguising actual sex discrimination.

Further, at page 22, specifically with respect to advancement from assistant professor to associate professor, which is involved in this case, it is provided "An associate professor should have completed all the formal academic preparation for a teaching career and should have had substantial experience in teaching, research, advance study or applicable non academic professional experience. He should have demonstrated the capacity and will to maintain *teaching effectiveness* and should have shown a capacity for continuing growth as a teacher, as a scholar and as a member of his profession. He should have made substantial progress in attaining eminence in a scholarly or professional field."

It is clear that the tenured faculty in the biochemistry department carefully reviewed these criteria in arriving at their decision with respect to plaintiff. It is also true that the weight given various criteria may vary from department to department and from school to school. For instance the service factor included under other contributions may be given less weight in the case of a person in the biochemistry department than in the clinical department of pathology. (See T. 10746 and 11564).

■ As pointed out the decisions as to the weight to be given these respective criteria and the extent to which a given assistant professor meets them or falls short is a matter which primarily must be handled by the tenured faculty who are in the best position to make these judgments. See *Peters v. Middlebury College*, supra.

■ It is also true that the court should not be involved in constantly reviewing the multitude of personnel decisions made daily by public agencies even though the individual decision subject to review may be mistaken or actually bad. See *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) and also *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) where the court said: "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion."

■ The court recognizes of course that *Bishop v. Wood* was a suit involving a policeman under 42 U.S.C. § 1983 and was not concerned with sex or race discrimination. It was not a case where consideration by the court is mandated by Title VII to insure insofar as is humanly possible that motives of sex discrimination are not operating behind a seemingly innocent facade. The same general thinking, however, is apropos. All the court can do is to determine whether reasonable good faith was shown and whether fair consideration was given to the matter by those having the right to decide so as to determine that sex (or race) discrimination was not actually a factor in arriving at the decision. If the criteria used and the procedures followed were reasonable and rationally related to the decision reached this is about as far as the court can go. *Cussler v. University of Maryland*, supra. The testimony is also clear that certain factors should not be considered such as hardship on the individual professor or difficulty in obtaining employment elsewhere. These do not constitute reasons for granting of tenure and promotion. See Mandel T. 829; Ramey 1163. We must always bear in mind that under *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972) in a case where there are no criteria for promotion except the unfettered recommendation of a foreman this can become a ready mechanism to conceal discrimination. In the instant case however the criteria contained in the faculty handbook were as definite as possible considering the elusive nature of professional qualifications and teaching ability. The question is were they fairly applied or were they used as a convenient pretext to disguise sex discrimination?

### 3. Was Fair Consideration Given to the Matter of Plaintiff's Promotion and Granting of Tenure

This court recently had a similar question before it in the case of *U.S. v. Wattsburg Area School District*, 429 F.Supp. 1370 (W.D.Pa.1977). In that case following *Faro v. N.Y.U.*, *supra*, this court pointed out that it did not have sufficient expertise to appraise the qualifications of those in the teaching profession whether university professors or elementary school teachers. It was held however that where the defense was based upon allegedly superior qualifications of the person given the job the court does have the right to insist under 42 U.S.C. § 2000e–2(a)(1) and (2) that fair consideration be given to the matter and that sex discrimination be absent in arriving at the decision. See *King v. New Hampshire Department of Resources*, 420 F.Supp. 1317 (D.N.Hampshire 1976) in turn citing *Pond v. Braniff Airways Inc.*, 500 F.2d 161 (5th Cir. 1974) wherein it was said "Courts must be extremely careful to determine that the reasons given for selecting a male applicant over a female applicant are not simply a ruse disguising true discrimination".

In *Wattsburg* there was a question as to who had the better qualifications but the court held that sex discrimination was made out where it appeared that the administration had made up its mind in filling a vacancy that only males need apply and the decision to select a specific male had been made in advance before there was any posting of the vacancy and before the female teacher had any chance to present her application (which was on file) or be interviewed.

In the instant case plaintiff does claim that the entire tenured faculty of the Department of Biochemistry was motivated by sex discrimination that no proper consideration was given to her credentials and that the unanimous decision of the tenured faculty (P. Ex. 9) was mere window dressing to disguise sex discrimination.

This court determines to the contrary.

■ In the findings in connection with the granting of the preliminary injunction in this case in Finding 25 the court spoke of solicitation of outside documentation to discredit plaintiff in order to substantiate the decision of the tenured faculty. After consideration of all the evidence presented on this matter at the trial on the merits the court concludes that this is not correct that at the meeting of the tenured faculty Dr. Ihler was the one who suggested that the chairman of the department, Dr. Heath write to others to be certain that they were not inflicting an injustice upon plaintiff; that evaluation of her research from outside scientists of renown be sought to be sure that her research was not of such a nature and of such outstanding quality that her deficiencies in respect of teaching and services should be overlooked. See T. 7328–39. The fact that Dr. Heath wrote the letters to Drs. Abeles and Kaplan on October 27, 1971 immediately after the meeting of the tenured faculty when there was no indication that a lawsuit was brewing, indicates to the court that the purpose in seeking these letters was as a matter of fairness to the plaintiff and not to bolster a decision which the department realized was going to cause it serious trouble.

The court has been greatly concerned as to whether Dr. Heath the department chairman, had made up his mind two months in advance of the meeting of the tenured faculty to get rid of plaintiff and overrode the better judgment of the other faculty at the meeting. In August 1971 he had approved her grant renewal application which carried her grant to 1975 two years beyond the expiration of the term of her contract. (2756). It is also true however that Dr. Heath in August 1971 appears to have formed an opinion as to the relevancy of plaintiff's research. At page 2754–55 the following occurred:

Q. At that point, Dr. Heath, had you formed some opinion with respect to the direction of her research as of August 1971?

A. I had seen her curriculum vitae at that point, her publications record, state of research interests. I knew something about it, yes.

Q. Is it fair to say you didn't think the stated research interests fit in with your concept of the department?

A. They did not, as I perceived the long range development of the Department. I didn't think that was an area of research I would be interested in developing to a great extent.

Q. When you say to a great extent, don't you mean that you didn't want her to be a member of the Department or a member of the tenured faculty?

A. That is the implication.

Dr. Heath admitted that he did not mention this conclusion that her research was not relevant to the mission of the department to the plaintiff or to anyone. (See P.I. p. 561, 562. See also T. 2867). Defendant's Exhibit 619 the grant application shows he had approved it on August 23, 1971.

See also 2849 where Heath admits again that he had not told Johnson of the conclusion to which he had arrived.

█ The court finds that at this point Dr. Heath knew that he as chairman of the department had the right to make a unilateral decision whether or not to recommend her to Dean Medearis, the head of the department, for promotion and tenure but he did not want to make the decision on his own although he could have done so and in order to be fair with her he wanted to get the considered judgment of his colleagues on the tenured faculty of the department. See P.I. 311. There is no indication, however, that Heath ever revealed his conclusions as to her research to anyone; either to plaintiff or to other members of the tenured faculty, prior to the meeting of the latter on October 27, 1971. The court was naturally concerned as to whether Heath had gone into this meeting of the tenured faculty with a settled conviction in his mind and used his influence upon the other members of the faculty to secure their backing in the decision to refuse the plaintiff promotion and tenure. A careful review of all the evidence on this question convinces the court that the contrary is the case, that Heath did not express his opinions at the faculty meeting of October 27, 1971 until all the others had spoken. If Heath had previously made up his mind, this did not affect the outcome the unanimous decision of the tenured faculty not to extend her tenure and promotion. See Axelrod P.I. p. 625. The court finds that Dr. Heath made no attempt to influence the views of the other faculty and in fact had no means of enforcing upon them a decision contrary to their own views. See 3327-8, 3359 Heath, 10120-21 Hofman, 11611-12, 11852-3 Nikada, 7348 Ihler. Yet the decision of the faculty was unanimous.

Dr. Ihler at preliminary injunction page 671 says no final decision was reached at this meeting and that in a desire to be fair he requested and the others concurred that Dr. Heath write to Drs. Abeles and Kaplan.

The record shows that all the factors which were the criteria for a promotion were considered by this committee. The reason for holding the meeting at this time was as stated by Dr. Heath that he wanted to give plaintiff as much time as possible to obtain a position elsewhere.

█ It also appears that the tenured faculty did consider what they themselves knew as to plaintiff's lectures and various evaluations by students. While the court is reluctant to rely upon student's surveys as demonstrating the fitness or unfitness of a faculty member nevertheless we cannot say it was unreasonable for the tenured faculty to consider this along with other matters in the meeting.

As to the relevancy of the plaintiff's research to the mission of medical school it appears this matter was duly considered by the tenured faculty who like Dr. Heath felt that the research being done by the plaintiff was not aimed at the function of a department of biochemistry in a medical school, to wit: instructing medical students on the elements of biochemistry to assist them in becoming learned in their profession. Dr. Nikada at 11602-3 states Dr. Johnson was present at faculty meetings where Heath had outlined his goals for the department and was well aware of the mis-

sion of the department as a part of the medical school. The evidence shows however that whether aware or not she could not at any time prior to expiration of her contract on June 30, 1973 have redirected her research goals so as to fit in with what Heath conceived to be the function of this department. See also Heath 2675–78.

The court further finds that upon receipt of the letters from Drs. Abeles and Kaplan Dr. Heath disclosed the nature of the replies to the other members of the tenured faculty. See T. 2981 and Nikada 11615.

The decision to refuse her tenure was not finalized until March 8, 1972 after evaluating the replies and therefore the court cannot fault Medearis or Heath for their handling the matter in between times when it has not been finalized. It also appears Medearis lost his temper at one time and threatened to have police drag plaintiff's lawyers out of the building. (P. Ex. 116) but this only occurred after plaintiff stated she was bringing her own lawyers in to see him at a time when he could not secure the attendance of university counsel. There may also have been a dragging of the feet in the Chancellor's office and something similar to a run around given by shoving plaintiff to Posvar to Cheever and back to Posvar again. But in any event this had nothing to do with what the court finds to be the basic fairness of the original decision by Heath and the tenured faculty not to extend her tenure or promotion.

The court further finds that no retaliation of consequence which occurred by reason of plaintiff filing charges before the EEOC and bringing this suit. Most of the matters were of little consequence, there was no attempt to remove her from her job and in any event many of the alleged retaliatory acts were provoked by plaintiff's conduct in circulating cartoons depicting the faculty as academic pigs and making crude remarks in the laboratory and referring to Medearis and Heath as pigs.

### 4. Plaintiff's Prima Facie Case

The court has previously in this discussion indicated that in its opinion plaintiff made out a prima facie case in accordance with the guidelines laid down in *McDonnell Douglas v. Green, supra.*

The court notes that the tests of McDonnell Douglas are not immutable in their application to all cases. As a matter of fact in Footnote # 13 the Supreme Court itself said in *McDonnell Douglas* : "The facts necessarily will vary in Title VII cases and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations". This is of particular importance with respect to defendant's argument that Number (iv) of the guidelines for a prima facie case under *McDonnell Douglas* put plaintiff out of court. This reads: "That after his rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications". In the instant case this is not plaintiff's complaint. Rather plaintiff complains that fair consideration was not given to her attainments and whether she met the criteria for promotion and tenure at Pitt (no one disputes that these criteria are fair and appropriate for consideration in making a decision of this kind) but rather she contends that not only was she not given fair consideration but that persons of less qualification were hired and jumped over her head and given promotion and tenure when under the up or out system she was being terminated. The court holds that this requirement of *McDonnell Douglas* is not a hard and fast requirement in all cases but if plaintiff has proved a case of the type claimed by her this meets the requirements of a prima facie case under *McDonnell Douglas.*

In granting a preliminary injunction to preserve the status quo in this case by retaining plaintiff in her then and present position as assistant professor in the biochemistry department the court made certain findings of fact which in its opinion, at the close of the preliminary injunction hearings showed a prima facie case and a likelihood of success upon the merits as required in the issuance of a preliminary injunction.

See *Johnson v. University of Pittsburgh,* 359 F.Supp. 1002 (W.D.Pa.1973). These findings are incorporated by reference in this opinion for the purpose of indicating that plaintiff had shown a prima facie right to promotion and tenure. In light of the extensive discovery engaged in by the parties and the extensive facts developed and articulated by defendants with respect to the decision after a full trial on the merits, the court holds now that the prima facie case was rebutted by the quality of evidence produced by the defendants and that while prima facie after listening to plaintiff's case and some defense testimony it would appear that a case of sex discrimination had been made out, upon consideration of the defendant's evidence however it is the court's opinion that the same has been rebutted. Therefore, unless the court can determine, which it cannot, that the defendant's evidence is pretextual under the guidelines of *McDonnell Douglas v. Green,* plaintiff must lose.

### 5. Statistics

The use of statistics was specifically approved by the court in *McDonnell Douglas Corp. v. Green,* supra where the court at 411 U.S. 804, 93 S.Ct. 1825 said: "Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and practice with respect to minority employment. On the latter point statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks."

As previously stated, we must always remember that *McDonnell Douglas* is an individual discrimination case, not a class action, and the same is true of the case at bar.

The court further elucidated the principles as to the use of statistics in *International Brotherhood of Teamsters v. U. S.,* —— U.S. ——, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), where in a class action case the court cited *McDonnell Douglas* for the use of statistics and went on to say: "We have repeatedly approved the use of statistical proof where it reached proportions comparable to those in this case to establish a prima facie case of racial discrimination in jury selection cases . . . Statistics are equally competent in proving employment discrimination. We caution only that statistics are not irrefutable. They come in an infinite variety and, like any other kind of evidence they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." The court further in Footnote # 20 said: "Consideration such as small sample size may of course detract from the value of such evidence. See e. g. *Mayor of Phila. v. Educational Equality League,* 415 U.S. 605 [620–621] 94 S.Ct. 1323 [1333], 39 L.Ed.2d 630 (1974)". In the cited case of *Mayor of Philadelphia,* the court also issued a caveat with respect to use of statistics where the samples were small saying "Furthermore, the District Court's concern for the smallness of the sample presented by the 13-member panel was also well founded". (415 U.S. 621, 94 S.Ct. 1333)

The court in *Mayor of Phila.* supra also had an observation which is of the greatest importance in the ultimate decision in our case where it said at page 620, 94 S.Ct. at page 1333: "Accordingly this is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded." The same observation is of great import with respect to this case where it can hardly be argued that all teachers and faculty members in the field of biochemistry can be considered fungible. Rather as has been pointed out the final decision must be based upon the individual qualifications of the person under consideration.

If the university had contended itself with mere assertions that it had not been guilty of sex discrimination its evidence would be subject to the same criticism as

that made of the company's evidence in *International Brotherhood of Teamsters* supra where in Footnote # 24 the court observed "The company's evidence apart from the showing of recent changes in hiring and promotion policies consisted mainly of general statements that it hired only the best qualified applicants. But 'affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion.'"

With respect to the statistics the court's attention was particularly drawn to three facts namely the disparity in salary between men and women members of the faculty in the medical school, the small numbers of women who were accorded tenure, the vast majority being kept in menial positions of research instructors and assistant professors without tenure and the fact that two years of affirmative action at the university concluded with less women on the faculty than at the start of the affirmative action program.

### (a) Salaries

These three statistical results were still operating in 1974 the boundary line drawn by the court with respect to evidence of discrimination evidence thereafter being considered too remote as to the 1971 decision. The evidence was still there that the average salary for a male tenured professor was $37,500 while the average salary for women with tenure was $27,000. See Garner PI page 415. The testimony by Dr. Gardner at page 7957 showed the average salary in 1972 72 of was $32,257 while women had an average salary of $22,395. In 1974, salaries had increased so that the average of the men was at $38,000 and that of the women at $25,000. It was further shown that women's salaries were 69.4% of the salaries of men in 1972 and 66% of men in 1974, indicating a retrogression. On the other hand, there is nothing in the records which indicate that plaintiff herself was discriminated against with respect to the salary paid to her. See Livolsi 10956–64 showing that plaintiff's salary was close to the average of that date of other assistant

professors at the university. There is also complaint that Glew was hired at a salary $100 more than plaintiff. This was explained by Heath (3348–51) as being required by the fact that Dr. Glew in order to be hired had to move to Pittsburgh from Louisville and it was customary to give a higher starting salary to a new professor who had to move. It is further pointed out that Heath had no part in setting plaintiff's salary for the year 1971 when he was not chairman of the department at the time the decision was made.

### (b) Numbers

In the preliminary injunction proceeding the court found that the school of medicine had consistently granted tenure to men employees and not to women in particular the court said at page 1008 of 359 F.Supp., "We agree that the statistics and other evidence of discrimination showing the imbalance of men and women with tenure in the School of Medicine and the Department of Biochemistry in particular make out a prima facie case which imposes upon the defendant the duty to go forward with rebutting evidence. _ _ _ The evidence offered in this case shows that out of 401 faculty members in the school of medicine, only 5 women have tenure. Six departments in the School had no women at all, eleven have no tenured women and only three have women with tenure. _ _ _ There are four times as many women eligible for tenure on the faculty as there were men" and during the last six years 70 men were given tenure as compared to 3 women. It further appears that 13% of the women were eligible for tenure but only 4% received it and in six years 70 men were given tenure but only 3 women. The mere stating of these figures shows that some explanation was called for. The facts surrounding these figures and many others were thoroughly explored at the hearing on the merits. Entirely aside from the weight of the evidence explaining these figures offered by defendant at trial the court now has the caution of the caveat in *International Brotherhood of Teamsters,* supra, relative to relying upon small samples and statistics derived there-

from to come to a conclusion particularly in a case involving discrimination against a single individual.

It will be noted that the Department of biochemistry in the Medical School had 14 faculty members, 8 graduate students, 14 research associates (post doctoral), 14 technicians, 3 full time and 1 part time secretaries. (T. 1583–89).

### (c) Affirmative Action Program

At the time of the hearing on the preliminary injunction in May, 1973, it appeared that the university had adopted an affirmative action program with respect to sex discrimination in 1970–71 as a federal contractor in response to an Executive Order. The evidence showed that the medical school had few plans for participation in this program so as to change the figures showing the imbalance between males and females to any substantial degree. See *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970) where it was pointed out that in that case adoption of an affirmative action program had little if any effect. The court was particularly concerned when vice chancellor Cheever on cross examination (PI 511) admitted that despite the adoption of the affirmative action program the number of women in the faculty at the medical school during the years 1970–72 instead of increasing had decreased, that the number of full time women professors had decreased and the number of women assistant professors had remained constant or decreased while numbers of men increased. It appeared to the court that this was negative action not affirmative action.

■ Since the above statistics came into the case we have had the benefit of a full trial upon the merits explaining these and other discrepancies and the Court of Appeals for this Circuit in *Commonwealth v. O'Neil* 473 F.2d 1029 (3d Cir. 1973) has admonished us that the statistical significance of statistics relied on by the court must be shown. Again in the case of an individual professor such as this the question is of discrimination in consideration of her qualifications, not whether sex discrimination may exist in the over all picture of the medical school. Otherwise the court may mandate promotion and tenure for an unqualified person.

### 6. Actual Discrimination Relied Upon by Plaintiff

■ Aside from statistics, what was the plaintiff's evidence with respect to actual sex discrimination i. e. disparate treatment of women for promotion? At the time Heath arrived (He actually took office July 1, 1971 but his selection had been known and he was consulted on decisions at least beginning in May 1971) Dr. Nikada, Ihler and Diven had been recommended by the previous acting head of the department Dr. Basford for promotions. These were all males. There appeared to be no question as to the promotions of Ihler and Nikada. There was some question about Diven whose primary appointment was in the department of pathology with a secondary appointment in the department of biochemistry. These appointments were effective July 1, 1971. (2714). The faculty committee of the university senate on Academic Freedom and Tenure (SAFT) on July 5, 1972 issued a report covering plaintiff's case which stated "There does seem to be some evidence of bias against women exercised by the members of the department of biochemistry of the school of medicine." (P. Ex. 12) Further the EEOC found there was discrimination at the university. See P. Ex. 912. At page 18 the Commission found there was reasonable cause to believe that the respondent University of Pittsburgh had engaged in sex discrimination against plaintiff Johnson in denying her tenure. This finding, of course, is in no way binding upon the court which was required to hear the case de novo but is to be considered along with the other evidence in the case. See *Ostapowicz v. Johnson Bronze Co.*, 369 F.Supp. 522 (W.D.Pa.1973) aff'd 541 F.2d 394 (3d Cir. 1976); *Smith v. Universal Services Inc.*, 454 F.2d 154 (5th Cir. 1972); *Heard v. Mueller Co.*, 464 F.2d 190 (6th Cir. 1972).

The court has also considered the House Report accompanying the Educational Amendments to the Equal Employment Opportunity Act of 1972. (U.S.Code Congressional and Administrative News Second Session 1972, p. 2154 et seq.) wherein the committee stated "Similarly in the area of sex discrimination, women have long been invited to participate as students in the academic process, but without the prospect of gaining employment as serious scholars.

"When they have been hired into educational institutions, particularly in institutions of higher education, women have been relegated to positions of lesser standing than their male counterparts." On the other hand it has been clearly held by the Supreme Court that in the light of 2000e–5(g) while the object of Congress is to remove barriers based upon discrimination, nevertheless the act is not intended to guarantee a job to everyone regardless of qualification. *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Plaintiff also complains that men with less qualifications were sought after she was denied tenure citing the attempt to hire Dr. Christopher Walsh and that Dr. Linda Cohen Barancik and Dr. Molly Vogt were terminated in the department. While the evidence is that the fields of Dr. Walsh and plaintiff Dr. Johnson are similar nevertheless the biochemistry faculty considered that Walsh was more medically oriented in his research. We cannot say that this decision was unreasonable. In any event Walsh was not hired, but went elsewhere.

With respect to Dr. Linda Cohen Barancik it appears that shortly after Dr. Heath arrived he met her in the hall and she told him she was looking for a job. She says the only thing he said he had was an opening to run an analytical ultracentrifuge but said nothing about a tenure stream position. She did not submit an application or her curriculum vitae because she thought he did not want her. He on the other hand said he did not think she was serious and further said he had been familiar with her work at Johns Hopkins and was not terribly im-

pressed with it. It cannot be said that serious consideration was given or intended by this interchange.

Finally we have the alleged discriminatory treatment of Dr. Molly Vogt who held a primary appointment in the School of Health Related Professions with a secondary appointment in the medical school department of biochemistry. Dr. Basford's letter (D. Ex. E) explains this whole contre temps as having resulted from his failure to communicate with Dr. Vogt that her contract for secondary appointment in the department of biochemistry would not be renewed. Dr. Basford was leaving on a trip to Europe and forgot to discuss this with Dr. Vogt who understandably became upset. Dr. Heath was not enthusiastic about joint appointments and stated (2896–97) that inasmuch as she was working full time in the health professions school she would have no time for biochemistry.

In addition, there was a problem raised by plaintiff with respect to the hiring of Dr. Carol Coffee, another female professor, who visited and spoke in the Fall of 1971 to the department of biochemistry. At that time they were considering 15 or 16 individuals to fill vacancies (PI. 534) and Dr. Coffee was hired for the term beginning in July 1972. While there were some delays, these were occasioned by the number of persons being considered.

The court has thoroughly reviewed all the various charges and counter charges with respect to the matters of hiring, promotion and discharges which have been presented in this case and finds that there were legitimate reasons in each case aside from sex discriminatory bias. The court is unable to say that the reasons articulated by the defendant in connection with these matters were pretextual merely. As stated the court has no particular expertise in judging the qualifications PhDs in biochemistry, any more than those of Doctors and Science in Nuclear Physics. For this we must rely upon the opinion of the experts in the faculty and other experts. We cannot say that plaintiff has borne her burden of showing by a preponderance of evidence

that the faculty's consideration of these matters was pretextual merely and that the reasons given were not bona fide in this case.

At this point the court states it has paid little or no attention to charges of influencing the testimony of Dr. Frances Finn by offering her an increase in salary for her favorable testimony at the preliminary injunction hearing. This arises from a crudity in a letter from Vice Chancellor Cheever to Chancellor Posvar. This salary increase had been filed July 18, 1972, and there was no showing that there was discussion in advance of testifying that this was to be a reward. See Cheever 3695, Posvar 3778, Finn 9377–80.

### 7. Plaintiff's Research Scholarship & Professional Stature

The court has little doubt as to plaintiff's scientific qualifications in general and in biochemistry in particular. The court finds from the mass of conflicting evidence submitted that plaintiff is an outstanding biochemist although it is true that her PhD was in chemistry and not biochemistry. No defense witness made a specific comparison of her scientific qualifications with those of others who were allegedly advanced over her and it appears that from the number of her referred publications that her scientifically accepted output has been greater than that of the others. She had been elected to the prestigious American Society of Biological Chemists. As to this it is noted that at the time of her employment in 1967 plaintiff received a letter from Dr. Moldave, then chairman of the biochemistry department, in which he made some suggestions relative to the obtaining of tenure (P. Ex. 1). In this he stated "I should think that a few publications and the concomitant election to membership by the American Society for Biological Chemists would satisfy these requirements". (Referring to research productivity of a scholarly nature as a factor in securing tenure.

Any reliance upon this letter as stating the only requirements for tenure by the plaintiff is entirely misplaced. It is clear that this letter from Dr. Moldave, as it states on its face, was only "Unofficial" advice. Dr. Moldave obviously had no authority to change the stated criteria for tenure. Only the president or chancellor can grant tenure. See *Roseman v. Hassler*, 382 F.Supp. 1328 (W.D.Pa.1974), 520 F.2d 1364 (3d Cir. 1975). Membership in the American Society of Biological Chemists was certainly considered at the time she came up for promotion. Dr. Glew one of the targets in the present case also was a member of this society (3249). Obviously, this could only be one of the factors considered.

The significance of referred publications mentioned above is as stated in *Cussler v. University of Md.*, 430 F.Supp. 602 (D.Md. 1977) namely that there is peer review of the work to determine whether it should be published and therefore "One usually can assume that publications in referred sociological journals are of good quality". (Cussler, Note 6)

The sum total of this testimony relative to plaintiff's qualifications is given in testimony of Dr. Cheever the Vice Chancellor of the University (PI 517) where the following occurred:

"THE COURT: Doctor, was there any question about her proficiency in advanced research?

WITNESS: Question as to her proficiency in the field of research?

THE COURT: Advanced research. Yes.

WITNESS: There was no question that she was doing credible research, sir. The question was was it related to biology, human biology and biochemistry in the school of medicine."

There is also no question that in the case of a university of the stature of the University of Pittsburgh advanced research is a very important function. Historically, for hundreds of years such universities exist not only for the teaching of students but also for the doing of advanced research to increase the knowledge of mankind. The amount of emphasis to be placed on such research in any given department, however, is a matter for the administration and trus-

tees of the university to determine, not the court. As was pointed out by Dr. Mandel and Dr. Heath, the research program in a department of biochemistry in a medical school should most appropriately be directed toward the elucidation of biologically important problems. (744, 2679). The sum total of all of this was stated by Dr. Axelrod in PI 626 wherein he states that plaintiff's research was adequate but it was not in the right direction for a medical school.

In 1970 a study had been made by the Youngner committee to determine whether the biochemistry department should continue as a department in the medical school or whether it should be merged into the biochemistry department in the school of arts and sciences. (See Youngner 8568–72; Myers 8909–10).

It was determined that the department of biochemistry should continue in the school of medicine with a mission to teach medical students and do research oriented toward medical science. It was felt it was important for medical students to understand the clinical relevance of biochemistry to the field of medicine. Therefore it was determined that the teaching of biochemistry to medical students was to be the first mission of the department with the teaching of graduate students in general as a secondary function. (See Myers 8911–13). It was a further finding of the committee that the department had been ineffective in carrying out these responsibilities. (See Myers 8911–13; Youngner 8625). It was in light of this background that Dr. Heath came in July 1971 to chair this department. The court cannot say that the decision in this respect was wrong since this is not our function. We therefore conclude, as heretofore stated, that there is little doubt as to plaintiff's qualifications as a biochemist but on the other hand we cannot say the decision that her research was not relevant in the mission of a department of biochemistry in a medical school was unreasonable. This is a matter for academic expertise in the field and not for the court.

The court further determines that the approval by Dr. Heath in August, 1971 of an extension of plaintiff's grant from the National Institute of Health extending to 1975 is certainly not conclusive in putting the imprimatur of relevancy to the mission of the medical school on the plaintiff's research. It appears that such approval is a pro forma matter and does not necessarily indicate that the department chairman has examined the direction of research in depth.

The court also makes no finding as to the citation method of appraising the value of a scientist's work as expounded by Dr. Davies in this case. The court at the present time feels that this new method has not yet been so tested and examined as to justify reliance upon it in court particularly with respect to a given individual.

The sum total of this is that while the court might feel that plaintiff's research is valuable in the field of medicine and is on the very forefront of the expansion of human knowledge for the extension of life, it is not for this court to make such a decision which can only be made by those who have acquired PhDs and spent years in the field. All we can ask is that the decision be made without influence of sex discrimination and we are unable to find that such invidious influence determined the decision.

### 8. Plaintiff's Teaching Ability

One of the main items considered by the tenured faculty in arriving at its decision to deny tenure and promotion to plaintiff was her performance as a teacher. (See P. Ex. 9). In paragraph B the tenured faculty described her teaching as "disastrous" and stated she demonstrated "a virtually complete inability to organize and convey a substantive body of information to students". The minutes also recite the incident referred to in Finding of Fact 27.

The court has approached this question of teaching ability with considerable doubt, in view of the fact that in prior years there does not appear to have been any criticism of her teaching and also in view of the fact that at PI 51 there was evidence that Dr. Heath, the department chairman, had told her after one of the lectures in September 1971 what a great lecture it had been. On

the other hand, we have the instance referred to in Finding 27 and the fact that in recent years increasing weight has been placed upon teaching ability. See Davies PI 191. We further have an evaluation by Dr. Axelrod who impressed the court as completely impartial and credible who stated at PI 619 that plaintiff's teaching performance was inadequate. The court has placed little reliance on students' surveys. The value of these surveys was deprecated by Dean Ebert (10825–6) and it was further testified by Dr. Davies at the preliminary injunction hearing that student surveys always result in the students in a given course rating a teacher, or professor, some of them as excellent, others as terrible and in between many who say passable, mediocre etc. The disruption referred to Finding 27, however, was of a different kind.

It is obvious that a professor may be possessed of excellent qualifications as a research scientist and not necessarily be able to prove his or her worth as a teacher. It is also obvious that the court and the administration of universities cannot permit students to exercise a veto over professors who may be world renowned scientists and yet if the students rate them unfavorably can be terminated at any time because of unpopularity. It has also been pointed out that in some cases difficult courses have to be given to the students and the material is such that it is difficult for even the best teacher to get it across.

We have other evaluations here. The entire faculty sat in on the lectures of September, 1971, at the request of Dr. Heath and thus were in a position themselves to make a determination of plaintiff's effectiveness as a teacher. In addition to Dr. Axelrod, Dean Medearis described the teaching of the plaintiff as poor (PI 361; 6475) and Vice Chancellor Cheever at PI 482 says her teaching was not up to standard.

Dr. Ihler at PI 635, 636 described plaintiff's teaching as about the worst he had heard. He pointed out it is necessary for medical students to learn this material on biochemistry and pass an examination on it:

if they have not been able to understand the material they run the risk of not passing examinations.

It was many times stated and the court finds it to be true that the main mission of a medical school is to instruct medical students so that they can become physicians who go out and treat the public. If the various departments of the medical school are not fulfilling this mission then the school is failing in its purpose.

The court finds the weight of the evidence is that plaintiff's teaching was not adequate and while there are some allegations to the contrary and there had previously been no criticism of her performance, nevertheless the court cannot say that the tenured faculty was unreasonable in considering this factor and in arriving at the conclusion they did. This is an important criterion in connection with the decision to promote and grant tenure. While it was well stated by Dr. Ebert that in cases where one has an outstanding scientist of national or international reputation, one may decide to promote and give tenure notwithstanding inability to come across as a teacher, this however is not one of those cases. The court determines that plaintiff has not carried her burden of proof in demonstrating that this is a pretextual reason and therefore we cannot fault the tenured faculty for considering it as one of the main elements in arriving at their decision.

The court concludes that plaintiff has not made out a case of a violation of Title VII by showing that the decision was based upon sex discrimination. The court further finds that much of the difficulties which were portrayed before the court in this case represented a clash of personalities between the plaintiff on one hand and Heath and Medearis on the other. Most of the complaints on both sides were petty and consisted of conduct on both sides unworthy of scientists with PhDs. But if the decision was based on the clash of personalities, it is outside the provisions of the Act under 2000e–5(g) and also furnishes no basis for an action under the Civil Rights Act of 1866 and 1870. The court has previously deter-

mined there was no basis for the charges of retaliation.

### B. State Action 42 U.S.C. §§ 1983 and 1985(3)

Unlike Dr. Ina Braden, the plaintiff in *Braden v. University of Pittsburgh*, 552 F.2d 948 (3d Cir. 1977) this plaintiff Dr. Sharon Johnson has two strings for her bow. She claims not only sex discrimination in her termination and denial of promotion and tenure under 42 U.S.C. § 2000e–1, et seq, being the Civil Rights Act of 1964 with which we have previously dealt but she also claims a violation of her Constitutional Rights under the Civil Rights Acts, of 1871, 42 U.S.C. §§ 1983[2] and 1985(3)[3] of which action this court has jurisdiction under 28 U.S.C. § 1343. We are dealing here with a large university having 35,000 students and 7500 employees (Rea 8229). Particularly with respect to 1983 she claims a violation of her right to equal protection and a denial of due process of law under the Fourteenth Amendment.[4]

Before examining the details of her claim of violation of Constitutional Rights under 1983 and 1985(3) the court must first determine whether the University of Pittsburgh is a person acting "under color of any statute, ordinance, regulation, custom, or usage,

of any State or Territory". As heretofore noted Judge Sorg of this court first held there was no state action in 343 F.Supp. 836 (W.D.Pa.1972). This dismissal was on the face of the pleadings. The Circuit held that there was sufficient allegation of state action to require a determination of this matter on the merits. *Braden I*, 477 F.2d 1 (3d Cir. 1973). Upon remand, Judge Sorg again re-examined the matter thoroughly on a motion to dismiss, apparently turned into a motion for summary judgment as a result of consideration of matters de hors the record, and determined that the evidence showed state action with respect to the University of Pittsburgh and therefore denied the motion for dismissal or summary judgment. 392 F.Supp. 118 (W.D.Pa.1975). This was affirmed by the Circuit in *Braden II*, 552 F.2d 948 (3d Cir. 1977). The court recognizes the limited nature of the holding in *Braden II*, as stated in the concurring opinion of Circuit Judge Garth, that all the court was doing was affirming the denial of summary judgment. The ultimate determination would have to await the trial on the merits.

In this case, it was stipulated that all the evidence offered contained in the record in the *Braden* case before Judge Sorg would be incorporated by reference in

---

**2.** "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**3.** "(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal man-

ner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

**4.** ". . . nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

this case for the purpose of determination of the state action question. Under these circumstances we hold consistent with the decision of Judge Sorg and of the Third Circuit that the record showed sufficient state action to bring the University of Pittsburgh under 1983. We therefore adopt the findings of Judge Sorg as set forth in 392 F.Supp. 118 and conclude that for the purpose of the 1871 Civil Rights Act the University of Pittsburgh, which is presently incorporated under a Pennsylvania Act entitled "University of Pittsburgh-Commonwealth Act" 24 Purdon's Pa. Statutes § 2510–201, et seq, is an instrumentality of the state government of Pennsylvania for the purpose of determining whether actions by it constitute state action from which suit may be brought under 1983.[5] See also *Hollenbaugh v. Carnegie Free Library*, 545 F.2d 382 (3d Cir. 1976).

The court thus determines that there is state action involved here but this does not help the plaintiff with respect to final resolution of her claims.

### 1. Due Process Right to Hearing

■ The court finds there was no requirement that plaintiff be granted notice and hearing with respect to her promotion to associate professor, grant of tenure to her or in the alternative termination of her employment at the University of Pittsburgh for the reason that she had no property right in her employment. Plaintiff was in the nature of a probationary professional employee. Her two contracts each expired at the end of three years. Thus her first contract expired July 1, 1970 and her second contract by its own terms expired July 1, 1973 and without a contract she was automatically out—"no contract no work". *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Roseman v. Ind. Univ. of Pa.*, 520 F.2d 1364 (3d Cir. 1975). There was no evidence of any implied promise to

extend her tenure except the letters of Dr. Moldave giving unofficial advice which the court has previously held did not constitute a contract or vary the requirements of tenure which could only be granted by the Chancellor. A mere expectancy that plaintiff might be retained if she did certain things is clearly not enough to invest her with a property right in her employment at the University.

### 2. The Court Finds No Violation of Plaintiff's Freedom of Speech or Other First Amendment Rights in the Action Taken

■ There is no evidence that she was denied promotion and tenure because of remarks made on matters of public interest critical of the university or its faculty. See *Roseman v. Ind. University*, supra; *Keddie v. Penna. State Univ.*, 412 F.Supp. 1264 (M.D.Pa.1976); *Ruhlman v. Barger*, 447 F.Supp. 435 (W.D.Pa.1976); *Commonwealth ex rel Rafferty v. Philadelphia Psychiatric Center*, 356 F.Supp. 500 (E.D.Pa.1973)

### 3. The Court Finds There was No Denial of Liberty Under the Fourteenth Amendment Taken

■ A failure to recommend for tenure is not a denial of liberty. *Board of Regents v. Roth*, supra. In case a stigma is placed upon the plaintiff as a result of charges of immorality or dishonesty in connection with the termination then there must be a notice and a chance to be heard. *Board of Regents v. Roth*, supra. In *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) it was held that the fact that a person is simply not rehired but remains as free as before to seek another job does not amount to deprivation of liberty and that this is true in the case of a discharge from a public employee whose position is terminable at will when there is no public disclosure as to the reasons for the discharge. The latter case also holds that even if the discharge is based upon

---

**5.** It is noted that the faculty handbook which is in evidence in this case as P. Ex. 2 contains on its title page the following: "Handbook for Faculty, University of Pittsburgh of the Commonwealth System of Higher Education".

false information there is still no deprivation of liberty which can be remedied under the Civil Rights Act, 42 U.S.C. § 1983. See also *Keddie v. Pa. State Univ.*, supra.

■ Making a person less attractive for employment is not deprivation of liberty; the discharge must be based upon false and defamatory charges. *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977).

### 4. Denial of Equal Protection of the Laws

■ The court holds there has been no showing that the tenured faculty acted arbitrarily or capriciously in denying plaintiff tenure or gave plaintiff any different consideration than was given male assistant professors. What has previously been said with respect to the reasonableness of the action of the tenured faculty in refusing promotion and denying tenure is equally applicable here. The tenured faculty may have shown bad judgment and may have acted on insufficient information but this does not result in a violation or deprivation of constitutional rights under *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), supra.

### 5. No Cause of Action under 1985(3)

1985(3) was obviously enacted in an endeavor to prevent activities of the Ku Klux Klan and other organizations engaged in denying blacks their Constitutional rights particularly equal protection of the laws in the South after the Civil War. It covers private conspiracies as contrasted with state action under 1983. As was stated by the Court of Appeals for this Circuit in *Robinson v. McCorkle,* 462 F.2d 111 (3d Cir. 1972) "a conspiracy claim based upon 42 U.S.C. 1985(3) requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals."

It is true that in *Pendrell v. Chatham College,* 370 F.Supp. 494 (W.D.Pa.1974) Judge Teitelbaum of this court on a motion to dismiss held the allegations of conspiracy with respect to animus towards women as a class were sufficient to withstand the motion in a suit based on 1985(3), under *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). This court has so held in this case but upon consideration of all the facts we conclude no such conspiracy has been shown by the evidence.

■ Further the court holds that conspiracy among agents of a single entity, in this case the University of Pittsburgh, is not sufficient to support a cause of action under 1985(3). This is in accord with the familiar rule that a person cannot conspire with himself and therefore for the agents of a single corporation to conspire among themselves and not with outsiders does not state a cause of action under 1985(3). See *Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir. 1972) the previous holding of the court in the instant case and *Keddie v. Penna. State Univ.,* supra.

■ The court holds that nothing has been shown here which even approaches an intentional and purposeful discrimination against plaintiff because of her sex which would constitute invidious class based discrimination and a conspiracy under 1985(3). This is amply shown by the discussion contained in that portion of the opinion with respect to the cause of action under Title VII.

In light of this holding with respect to 1985(3) the court finds it unnecessary to reach the Constitutional question posed by defendants that if 1985(3) is to be applied to sex discrimination then it is unconstitutional.

### C. Cause of Action Under Equal Rights Clause of Pennsylvania Constitution

Plaintiff has also included in this case a pendent cause of action under Pennsylvania State Law as a result of an alleged violation of Article I § 28 of the revised Pennsylvania Constitution which states: "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual".

The question naturally arises whether this recently enacted section of the Bill of

Rights of the Pennsylvania Constitution is self executing. Cf. *Davis v. Burke,* 179 U.S. 399, 21 S.Ct. 210, 45 L.Ed. 249 (1900); *Commonwealth v. National Gettysburg Battle Tower, Inc.,* 454 Pa. 193, 311 A.2d 588 (1973).

██ Even if it should be held by the Pennsylvania courts that Article I Section 28 is self executing, we hold it is not more extensive than 42 U.S.C. § 1983 of the Civil Rights Act and Title VII relative to employment discrimination based upon sex which we have previously held does not exist in this case.

██ In any event because of doubts as to the position which may be taken by the Pennsylvania courts with respect to this matter we think it proper to abstain until questions under this Article are clarified by the Supreme Court of Pennsylvania or the Pennsylvania Legislature. Under *U.M.W. v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) we have discretion as to whether to exercise jurisdiction over a pendent cause of action and we determine under the circumstances this is not an appropriate case to exercise such jurisdiction. We are concerned here with the delicate question of interpretation of the Pennsylvania Constitution and such a question more appropriately should be left to the Supreme Court of Pennsylvania which is charged with the duty in proper cases of issuing finally determinative ruling with respect to the interpretation of this Constitution.

### D. Conclusion

This has been a long and exhausting piece of litigation posing many difficulties for the court as well as for counsel. The case has been thoroughly and exhaustively tried if not over tried by able counsel on both sides. The court is thoroughly appreciative of the important and serious issues involved in this case. On the one hand we have the important problem as to whether sex discrimination is operating to the detriment of women in the halls of academia. If so Congress has mandated that it must be eradicated. Colleges and universities must understand this and guide themselves accordingly. On the other hand we also have the important question as to whether the federal courts are to take over the matter of promotion and tenure for college professors when experts in the academic field agree that such should not occur. In determining qualifications in such circumstances the court is way beyond its field of expertise and in the absence of a clear carrying of the burden of proof by the plaintiff, we must leave such decisions to the PhDs in academia.

### CONCLUSIONS OF LAW

(1) The court has jurisdiction of the parties and of the subject matter of this action.

(2) Plaintiff by the weight of the evidence has made out a prima facie case of sex discrimination in the defendants failing to grant her promotion and tenure and her resulting termination under Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. § 2000e et seq.

(3) The defendants have articulated legitimate and nondiscriminatory reasons for the action taken in failing to grant plaintiff promotion and tenure in the department of Biochemistry of the School of Medicine at the University of Pittsburgh with her resultant termination. These reasons are ineffectiveness of her teaching and lack of relevancy of her research to the mission of said department. The defendants have proved their justification by a preponderance of the evidence in the case.

(4) Plaintiff has not shown by a preponderance of the evidence that the reasons advanced for the action taken with respect to her were pretextual.

██ (5) Title VII of the Civil Rights Act of 1964 as amended by the Educational Amendments of March 24, 1972 P.L. 92–261 is applicable to the University of Pittsburgh with respect to actions taken on and after March 24, 1972 in failing to grant plaintiff promotion and tenure with resultant termination of her employment.

(6) The plaintiff has failed to establish by a preponderance of the evidence that retaliation against her occurred because of

**1372**

filing EEOC charges which retaliation would be in violation of 42 U.S.C. § 2000e–3.

(7)   Plaintiff has failed to establish by a preponderance of the evidence that the action of the defendants in refusing to grant her promotion and tenure with resultant termination was in violation of Title VII of the Civil Rights Act of 1964 as amended.

(8)   The University of Pittsburgh is a state institution whose conduct may be actionable under the Civil Rights Act 42 U.S.C. § 1983.

(9)   The plaintiff has shown no deprivation of any right guaranteed under the First Amendment to the U.S. Constitution.

(10)   The plaintiff has shown no violation of due process of law which would be cognizable under the Civil Rights Act and the Fourteenth Amendment to the U.S. Constitution.

(11)   Plaintiff has shown no denial to her of equal protection of the laws which would be a violation to the Fourteenth Amendment to the Constitution and cognizable under 42 U.S.C. § 1983.

(12)   The plaintiff has shown no conspiracy against her in violation of 42 U.S.C. § 1985(3).

(13)   The plaintiff has shown no denial or abridgement of equality of rights in violation of Article I Section 28 of the Pennsylvania Constitution because of her sex.

(14)   The court in the exercise of its discretion determines it should not exercise pendent jurisdiction over any cause of action which plaintiff may have as a result of the alleged violation of Article I Section 28 of the Pennsylvania Constitution.

(15)   The complaint in this case should be dismissed in its entirety against all defendants and judgment should be entered in favor of the defendants and against the plaintiff and the preliminary injunction heretofore entered in this case should be dissolved.